William Michael MASON, Appellant,

v.

The STATE of Texas, Appellee.

No. 71479.

Court of Criminal Appeals of Texas,
En Banc.

April 26, 1995.

Rehearing Overruled June 21, 1995.

Allen C. Isbell, James Sims, Houston, on appeal only, for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft, Jeannine Southwick & Craig Goodhart, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant was convicted of the offense of murder in the course of committing kidnapping. V.T.C.A., Penal Code, Section 19.03(a)(2). The jury answered the special issues affirmatively and punishment was assessed accordingly at death. Article 37.071 § 2(b), V.A.C.C.P. Appeal to this Court is automatic. Article 37.071 § 2 (h), V.A.C.C.P. Appellant raises eleven points of error. We will affirm.

In his first point of error, appellant challenges the sufficiency of the evidence to support the underlying crime of kidnapping. *See* V.T.C.A., Penal Code, Section 20.03. Therefore, he posits that he can only be guilty of the lesser-included offense of murder.[1]

The evidence at trial established that on January 16, 1991, appellant, his daughter, Mandy Mason, and Mandy's daughter, Brittany, were all staying at the home of appellant's wife, Deborah Ann Mason, along with her son, Staton. At approximately six o'clock that evening, Thomas Mullins, a friend, arrived at Deborah's home in Humble looking for appellant's half-brother, Lonnie

---

1. Appellant does not contend that the evidence was insufficient to show beyond a reasonable doubt that he murdered his wife.

Carney, who was not present. Mullins decided to stay and talk to appellant and Mandy.

At about 8:00 p.m., appellant and Deborah argued over Deborah being "on drugs."[2] Appellant apparently had found some needles in the bathroom. When Deborah tried to go to her car and leave, appellant grabbed her by the hair and pulled her back in the house and into the bedroom. Deborah was hollering that appellant was hurting her, to let her go, and that she loved him. Deborah's hair at this time measured about three inches past her shoulders. Mullins testified he then heard about four or five "slapping noises" and Deborah saying "don't hit me. Don't hit me. I love you." She further said that she was sorry.

At this point, Mullins and Mandy took the two children to the store for some candy because Staton was crying. When they returned to the house, Mandy went inside to see if appellant and Deborah had finished their argument. They had not. Mullins, Mandy, and the children then drove around the block for about ten to fifteen minutes before returning to the house. Mullins testified that when they returned he did not notice any injuries to Deborah. At about 9:00 p.m., Mullins, Mandy, and the children again left to get dinner. Afterwards, they went to the home of appellant's mother, Juanita Carney, where they picked up Lonnie and then they all returned to Deborah's home to play poker.

Upon their arrival, Deborah showed Mandy a large bruise on her right hip. She said it was caused by appellant throwing her into the bathtub. Otherwise, Deborah did not appear to be injured.

The poker game lasted until about 1:30 a.m. After the game, Lonnie, Mandy, and Mullins began listening to the radio or watching television. Appellant was standing outside drinking his coffee and hollered in for Deborah to turn down the radio. Mullins testified that she responded that "it was her radio, that she wanted to listen to it loud and

she would listen to it loud." Lonnie then bet Deborah that he could turn it down and proceeded to knock her into the couch and on to the floor.

Appellant came inside, picked up Deborah by the hair, and dragged her to the bedroom. Mullins testified that he then "heard somebody hitting something in there," and Deborah saying "don't hit me. Don't hit me. I love you. I love you." Appellant then stated, "I'm going to kill you, bitch." Deborah managed to run out into the kitchen. Appellant followed and began hitting her again for thirty to forty minutes, once slamming her hard enough into a wall to knock items off the wall on the opposite side.[3] Deborah pleaded that she was "human" and appellant told her, "[N]o, you're not. You are a whore. You are a dog. You need to go live in a doghouse."

During this fight, Mandy and Mullins went into the bedroom to check on the children. Mullins remained there for the duration of the fight, but Mandy went in and out periodically. When Mandy went back into the kitchen, she heard appellant again tell Deborah, who was sitting on the kitchen floor, that he was going to kill her. Mandy could see no blood on Deborah's face.

Appellant then went into the bedroom to get a towel from the adjoining bathroom. On his way back to the kitchen, he passed Mullins and told him, "It's all over, Ace."[4] Upon returning to the kitchen, appellant tore the towel into strips. He yelled to Mandy to get his wallet and Terry Goodman's phone number. Appellant then had Lonnie call Goodman and tell him to come over; that he knows what is going on, and to bring some garbage bags, "[h]e knows what they're for." Mandy testified that she then heard Deborah say "[H]uman, Billy. Don't do this," and appellant replying "no, you are a whore. You are a dog. You need to die." Deborah's hands were now tied behind her back with a strip of towel. She was lying on the floor

2. At least one other non-physical argument occurred earlier in the evening.

3. Mullins, Mandy, and Lonnie never attempted to help Deborah or stop appellant. Both Mullins

and Mandy testified that they were too afraid of appellant to help her.

4. "Ace" was a nickname appellant had for Mullins.

with her face up against the wall and her knees bent.

Appellant next told Mandy to go and pack all of their things because they were going to his mother Juanita's home. She went to the bedroom and began packing when she again heard appellant say he was going to kill Deborah. Mandy returned to the kitchen where she saw appellant kick Deborah in the side. Deborah merely grunted. Mandy returned to the bedroom and continued packing. She never saw Deborah again. During this time, Mullins observed appellant carrying Deborah out the door with her feet and arms tied together behind her back. Deborah's hair was much shorter and there was a towel in her mouth. No blood was coming from her face or head. Mullins then heard the trunk of a car being closed. Mullins did not see Deborah again.

Terry Goodman and appellant's half-sister, Sandra, then arrived with the garbage bags. Mandy used two of the bags to finish packing her and appellant's things. After all of appellant's and Mandy's things were loaded in Goodman's truck, Mullins heard appellant tell Goodman that he wanted the garbage bags to stick Deborah in, weigh them down with rocks, and put them in the river. Goodman and Sandra then took Mandy and Brittany to Juanita's house. Before he left, Mullins noticed a clear plastic bag full of hair on the kitchen counter. He also saw appellant cleaning blood off the floor in the bedroom with a towel. Mullins and Lonnie then went to Juanita's in Mullin's truck. Appellant soon followed.[5]

About forty minutes after arriving at Juanita's home, appellant, Lonnie and Goodman left. The three returned about one and a half hours later. Appellant's pants were wet up to his knees and his boots were muddy. He told Mullins, Mandy, and Lonnie to tell anyone who asked that Deborah had left with two guys in a car and no one had seen her since. Later, appellant told Mandy that he took Deborah to the river, tied her up, hit her in the head with a brick, put her in

garbage bags, and buried her under some logs because "she ruined my good name."

Deborah's body was found under some logs in a backwash ditch along the San Jacinto River on January 27, 1991. She was "hog-tied" with strips of towel and covered with eleven garbage bags. Some of the bags contained pieces of concrete. Dr. Vladimir Parungao, Harris County Assistant Medical Examiner, performed the autopsy. Parungao testified that Deborah's death was caused by a "skull fracture due to blunt traumas" to her head. He stated the two head injuries were consistent with being caused by a rock or piece of concrete. He further testified the victim received several other injuries prior to her death: a fractured jawbone, contusions and bruises to the face, a bruise on the left leg, and a blunt laceration to her left hand. The body was dead when it was placed in the water.

Following appellant's arrest, he confessed to a friend, Rudolpho Perez Garcia. He told Garcia that he tied Deborah up in the car and drove her out to the river. When he pulled her from the car she begged, "please don't kill me. I love you." Appellant then stated that he hit her in the head with a rock.

◼ In reviewing a sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Gribble v. State,* 808 S.W.2d 65, 73 (Tex.Cr.App.1990), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).

◼ A person commits the offense of kidnapping when he knowingly or intentionally abducts another person. V.T.C.A., Penal Code, Section 20.03(a). "Abduct" means to restrain a person with the intent to prevent his liberation by either: (1) secreting or holding him in a place where he is not likely to be found, or (2) using or threatening to use deadly force. V.T.C.A., Penal Code, Section

---

**5.** It appears from the record that the group left Deborah's two and a half-year old son alone at the house for the remainder of the evening. Appellant and Mandy retrieved him the next morning.

20.01(2). Appellant claims that there is insufficient evidence to show he "abducted" his wife. He argues his intent was to conceal a murder victim's body not a living person, and that he did not use or threaten to use deadly force.

▮ Secretion and the use of deadly force are part of the *mens rea* of kidnapping, not the *actus reus* as appellant's argument presumes. *Brimage v. State,* —— S.W.2d ——, —— slip op. at 10 [1994 WL 511395] (No. 70,105, Tex.Cr.App., delivered September 21, 1994, rehearing pending). A kidnapping becomes a completed offense when a restraint[6] is accomplished, and there is evidence that the actor intended to prevent liberation and that he intended to do so by either secretion or the use or threatened use of deadly force. *Id.,* slip op. at 11, —— S.W.2d at ——. Therefore, the State had the burden to prove that a restraint was completed and that the appellant evidenced a specific intent to prevent liberation by either secretion or deadly force. *Id.,* slip op. at 12, —— S.W.2d at ——.

▮ Appellant concedes that a "restraint" did occur. Thus, the only remaining issue is whether appellant had the specific intent to prevent his wife's liberation by secretion or deadly force. The record supports evidence of the former. Appellant hogtied and gagged his wife and put her in the *closed*

trunk of the car, where she could not escape or be seen, in order to transport her to the river. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that appellant intended to abduct his wife. *Id.,* slip op. at 12–13, —— S.W.2d at —— – ——; *see also Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789. We hold the evidence was sufficient to support appellant's conviction for capital murder. Point of error one is overruled.

In appellant's second through fifth points of error, he complains that the trial court submitted an improper jury instruction on mitigating evidence. Specifically, he argues that: (1) the charge speaks to appellant's "personal culpability" as opposed to his "personal *moral* culpability;" (2) the trial court erred in refusing to submit his requested special issues;[7] and (3) the court failed to instruct the jury that they need not unanimously agree as to what evidence was mitigating. We disagree.

▮ At punishment, the jury must be allowed to consider and give effect to proffered evidence regarding the defendant's background, his character, and circumstances surrounding the offense that reasonably could be thought truly mitigating and thus reason-

6. V.T.C.A., Penal Code, Section 20.01(a) defines "restrain" as restricting a person's movement without consent, so as to interfere with his liberty, by confining him or moving him from one place to another. The restraint is "without consent" if it is accomplished by force, intimidation, or deception.

7. The following are appellant's proposed special issues:

"1. If you have answered "yes" to Special Issues One and Two, then you will answer the following question:
"DO YOU FIND BY A PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT WAS THE VICTIM OF CHILD ABUSE AND THAT THE DEPRIVATIONS SUFFERED BY DEFENDANT AS A CHILD TEND TO REDUCE DEFENDANT'S MORAL CULPABILITY AND THE DEFENDANT SHOULD BE SENTENCED TO LIFE IN THE PENITENTIARY?
"2. If you have answered "yes" to Special Issues One and Two, then you will answer the following question:

"TAKING INTO CONSIDERATION ALL OF THE EVIDENCE, INCLUDING THE CIRCUMSTANCES OF THE OFFENSE, DO YOU FIND FROM A PREPONDERANCE OF THE EVIDENCE THAT THE ABUSE AND DEPRIVATIONS SUFFERED BY THE DEFENDANT AS A CHILD TEND TO REDUCE DEFENDANT'S MORAL CULPABILITY SO AS TO WARRANT THAT A SENTENCE OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE BE IMPOSED?
"3. If you have answered "yes" to Special Issues One and Two, then you will answer the following question:
"TAKING INTO CONSIDERATION ALL OF THE EVIDENCE, INCLUDING THE CIRCUMSTANCES OF THE OFFENSE, THE DEFENDANT'S CHARACTER AND BACKGROUND, AND THE PERSONAL MORAL CULPABILITY OF THE DEFENDANT, DO YOU FIND THAT THERE IS A SUFFICIENT MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES TO WARRANT THAT A SENTENCE OF LIFE IMPRISONMENT RATHER THAT A DEATH SENTENCE BE IMPOSED?"

ably warranting a sentence less than death. *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 605–06, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). As the Supreme Court stated in *Penry v. Lynaugh:*

"Underlying *Lockett* and *Eddings* is the principle that *punishment should be directly related to the personal culpability of the criminal defendant.* If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" (Emphasis added.) 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989).

The special issues required by Article 37.071, V.A.C.C.P., allow the jury to consider and give effect to most types of mitigating evidence. *Jurek v. Texas,* 428 U.S. 262, 273–74, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976). However, defendants occasionally proffer mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues. *Penry,* 492 U.S. at 329, 109 S.Ct. at 2952. In such a case, the jury must be given a special instruction in order to allow it to consider and give effect to such evidence.

The trial court in the instant case submitted the following charge:

"You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circum-

stances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration."

We have already held that a nullification instruction such as this one is sufficient to meet the constitutional requirements of *Penry,* supra. *See Coble v. State,* 871 S.W.2d 192, 206–207 (Tex.Cr.App.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994); *see also Coleman v. State,* 881 S.W.2d 344, 356 (Tex.Cr.App.1994). The trial court did not err. Points of error two through five are overruled.

In points of error six and seven, appellant maintains that his First and Fourteenth Amendment rights were violated when the trial court allowed the State to present evidence concerning his membership in the Aryan Brotherhood or Aryan Nation. He complains that the State failed to show a nexus between his association with the organizations and the offense charged, and, also, failed to show appellant subscribed to the tenets of those organizations. Specifically, appellant posits that the evidence was not relevant.

The First Amendment protects an individual's right to join groups and associate with others holding similar beliefs. *Dawson v. Delaware,* 503 U.S. 159, 161, 112 S.Ct. 1093, 1096, 117 L.Ed.2d 309 (1992). However, the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing merely because those beliefs and associations are protected by the First Amendment. *Id.* at 165, 112 S.Ct. at 1098. Such evidence may be admissible if it is shown to be "relevant" to the issues involved

in the case.[8] *Id.* at 163–67, 112 S.Ct. at 1097–98. Future dangerousness is an issue relevant at the sentencing stage of a capital murder trial. *See* Tex.R.Crim.Evid. 401; Article 37.071 § 2(b), V.A.C.C.P.

▌ In order to prove the relevance of a defendant's membership in an organization or group, the State must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership in the organization. *See Dawson,* 503 U.S. at 163–67, 112 S.Ct. at 1097–98; *Fuller v. State,* 829 S.W.2d 191, 196 n. 2 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). In the instant case, the State presented both.

Mandy Mason testified that appellant told her on more than one occasion that he was a member of the Aryan Brotherhood and the Aryan Nation. Moreover, evidence from appellant's pen packets show he had been determined by the Texas Department of Criminal Justice to be a member of the Aryan Brotherhood. Royce Smithey, an expert on prison gangs, testified that the Aryan Brotherhood is a white-supremacist organization that recruits white inmates and engages in protection of members, drug activities, prostitution, weapons manufacture, escapes, contract killings and assaultive behavior. Qualifications for membership in the gang included not only being a member of the white race, but also the ability to "take care of business" in return for the organization supplying certain needs of the inmate.

▌ The trial court did not err in admitting the evidence of appellant's gang membership because it was relevant to the issue of future dangerousness and outside the protection of the First Amendment. *See Dawson,* 503 U.S. at 163–67, 112 S.Ct. at 1097–98;

*Fuller,* 829 S.W.2d at 196. Points of error six and seven are overruled.[9]

In his eighth and ninth points of error, appellant asserts that the trial court erred in sustaining the State's challenge for cause of venireperson Guidry. The court granted the challenge because Guidry stated that he would be unable to fully concentrate on the case if he was required to miss too much school. Specifically, appellant argues that Guidry should not have been excused because he was not disqualified for service under Article 35.19, V.A.C.C.P., or subject to challenge under Article 35.16, V.A.C.C.P. Further, Guidry did not request to be excused from jury service under a provision of Article 35.03, Section 1, V.A.C.C.P.

▌ A challenge for cause can be properly asserted on grounds which are not specifically enumerated in Article 35.16, V.A.C.C.P., where such a challenge is based on facts that show that the prospective juror would be "incapable or unfit to serve on the jury." *Allridge v. State,* 850 S.W.2d 471, 484 (Tex.Cr.App.1991), *cert. denied,* —— U.S. ——, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993) (venireman preoccupied with business); *Nichols v. State,* 754 S.W.2d 185, 193 (Tex. Cr.App.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989)[10] (venireman preoccupied with personal problems). Challenges which are not based upon any ground specifically enumerated in the statutes are ordinarily addressed to the sound discretion of the trial judge. *Allridge,* 850 S.W.2d at 484–85; *Nichols,* 754 S.W.2d at 193.

▌ During his voir dire, Guidry, a college freshman, stated that he would have trouble concentrating and giving his full at-

---

8. This is contrary to appellant's narrow belief that there must be a nexus between membership in the organization and the type of crime committed.

9. Without argument, appellant notes that the evidence was more prejudicial than probative because it was only introduced to incite the passions of two black jurors. *See* Tex.R.Crim.Evid. 403. We disagree. As the trial court notes, other evidence that was introduced "far outweighs anything this evidence might cause." The other evidence consisted of appellant's ac-

tions involving shaving his niece's eyebrow, head and pubic hair and calling her a "whore" because she had accepted a ride to her grandmother's from a black man. Also, Ted Stewart, a black man, testified that he observed the "white" appellant shoot and kill Stewart's (presumably black) friend for no apparent reason and then turn the gun on Stewart.

10. Overruled on other grounds, *Harris v. State,* 784 S.W.2d 5, 19 (Tex.Cr.App.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990).

tention to the case if he were to miss too much school. Prior to making his final ruling on the State's challenge for cause, the trial judge asked the following:

"THE COURT: I can't tell what you're talking about. Would you be a fair and impartial juror no matter what happened?

"MR. GUIDRY: Yes.

"THE COURT: With your job or schooling? I want your truthful answer.

"MR. GUIDRY: Not with my schooling.

"THE COURT: You feel if it interfered with your schooling you wouldn't pay attention? You would let that influence your verdict, is that correct?

"MR. GUIDRY: Yes."

The record in the instant case supports the trial court's decision that Guidry would be an unfit juror due to his preoccupation with school. *Allridge,* 850 S.W.2d at 484–85; *Nichols,* 754 S.W.2d at 193–94. The trial court did not abuse its discretion in granting the State's challenge for cause. Points of error eight and nine are overruled.

Finally, in points of error ten and eleven, appellant contends that the trial court erred in overruling his challenge for cause against venireperson Kwoka. When a trial court errs in denying a challenge for cause, the defendant is harmed only if he uses a peremptory strike and, thereafter, suffers a detriment from the loss of that strike. *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex. Cr.App.1986), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987). In order to preserve error, appellant must: (1) use all of his peremptory strikes; (2) ask for and be refused additional peremptory strikes; and (3) be forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause or granted him additional peremptory strikes.

In the instant case, appellant used all of his peremptory strikes, asked for and received three additional peremptory strikes, and named an objectionable juror. However, because appellant was granted three additional peremptory strikes, he did not suffer the loss of three strikes. There-

fore, for appellant to demonstrate harm and, hence, reversible error, he must show that challenges for cause on *at least* four venirepersons were erroneously denied. *Martinez v. State,* 763 S.W.2d 413, 425 (Tex.Cr.App. 1988); *Rector v. State,* 738 S.W.2d 235, 247 (Tex.Cr.App.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 202, 98 L.Ed.2d 153 (1987). Appellant identifies only one venireman that he maintains should have been excused for cause. Consequently, even if his challenge for cause against Kwoka was valid, he suffered no loss of a strike and, therefore, no harm. Points of error ten and eleven are overruled.

Finding no reversible error, we affirm the judgment of the trial court.

MALONEY, J., concurs in the result.

CLINTON, Judge, dissenting.

## I.

In his first point of error appellant contends the evidence was not sufficient to prove that when he "restrained" his wife before he killed her, he did so with the intent to prevent her liberation. Thus, although he admittedly murdered her in the course of falsely imprisoning her, he did not murder her in the course of a kidnapping. Compare V.T.C.A. Penal Code, §§ 20.02 & 20.03. Specifically he contends that the evidence shows he restrained his wife with the exclusive intent to kill her, and that there is no evidence he specifically intended to prevent her liberation.

The majority rejects this contention on authority of a single citation, *viz: Brimage v. State,* — S.W.2d — (Tex.Cr.App., No. 70,105, delivered September 21, 1994). *Brimage,* however, is a plurality opinion. It is, moreover, pending this Court's grant of the State's motion for rehearing, and although the State's motion does not assail the particular holding in *Brimage* that the Court relies upon today, this does not alter the fact that *Brimage* is not yet authoritative. In any event, the majority does not explain how *Brimage* serves to rebut appellant's argument. The Court has more work to do.

Appellant concedes he "restrained" his wife before he killed her. I take this to mean he admits that the evidence shows he "restrict[ed her] movements without [her] consent [i.e., by force]," either "by moving [her] from one place to another or by confining [her]." V.T.C.A. Penal Code, § 20.01(1) & (1)(A). He contends, however, that he did not "abduct" her in that he did not restrain her with the specific "intent to prevent [her] liberation by ... secreting [her] or holding [her] in a place where [she] is not likely to be found" or "using or threatening to use deadly force." See V.T.C.A. Penal Code, § 20.01(2)(A) & (B).

The majority answers that because appellant 1) admits he restrained his wife, and 2) the evidence clearly shows he did, in fact, "secrete" her, by placing her hog-tied body in the *"closed"* trunk of a car, *ipso facto*, the evidence shows an intent to prevent her liberation. Maj. op. at 575. The majority apparently relies on *Brimage* for this proposition.

In *Brimage* the plurality opined that in order to commit the offense of kidnapping, it is not necessary to actually secrete the victim or use or threaten to use deadly force against her. The only *actus reus* element of kidnapping is restraint. The act of restraining amounts to kidnapping, not just false imprisonment, when it is accompanied by a specific intent to prevent the victim's liberation; an intent to do so, moreover, in one of the two statutorily enumerated ways, either by secreting the victim or by using or threatening to use deadly force. *Id.*, Slip op. at 10–12, —— S.W.2d at ——–——. The evidence need not show an actual secreting or use or threat of deadly force to justify a kidnapping conviction.

When the evidence does establish a secreting in fact, however, the majority evidently believes this necessarily establishes an intent to prevent liberation by secreting. In short, actual secreting equals a specific intent to prevent liberation. I do not accept this equation. In my view it is possible to restrain by actually secreting without harboring a specific intent to prevent liberation. The instant cause presents a good example.

To say that one restrains and secretes another with the intent to prevent liberation is to say it is one's "conscious objective or desire" thus to prevent liberation. V.T.C.A. Penal Code, § 6.03(a). It is also possible, however, both to restrain and to secrete, not with the "conscious objective or desire," but only "with knowledge" that it will prevent liberation. V.T.C.A. Penal Code, § 6.03(b). That is to say, it is possible to restrain and secrete, being "aware" that it will prevent liberation, though preventing liberation is *not* the specific "conscious objective or desire."

In the instant cause, it is clear appellant's conscious objective or desire was to kill his wife and hide the body. It is clear that in order to do so he restricted her movement by force, substantially interfering with her liberty, by moving her from one place to another *and* by confining her. Thus, he "restrained" her. § 20.01(1) & (1)(A), supra. Moreover, when he hog-tied her and placed her in the trunk of the car and closed it, he "secreted" her; at least the jury could rationally have found he thereby "deposit[ed] or conceal[ed] her] in a hiding place." Webster's New Collegiate Dictionary (1979), at 1036. What is not so clear, however, is that in so secreting her it was his "conscious objective or desire" to prevent her liberation. His conscious objective was to take her to the river and kill her, and then dispose of the body. Undoubtedly the evidence supports a finding he was at least "aware" she would not likely be liberated while in the trunk. But "awareness" does not support a jury verdict that he kidnapped her, and thus cannot support a conviction for capital murder.

It may be consistent with the evidence presented to conclude that appellant had a "conscious objective or desire" to prevent his wife's liberation. But it is equally, if not more, consistent with the circumstantial evidence to conclude that he at best harbored an awareness that it was not reasonably likely she would be liberated if he put her in the trunk of the car in order to carry out what was his clear conscious objective, *viz:* to take her to the river (i.e., to "restrain" her) and kill her. The State offered no evidence to cause a rational jury to prefer one theory over the other. I have noted elsewhere that

"[t]his is no more than to say that as to the element of specific intent, the State has failed to carry its burden of production." *Nelson v. State*, 848 S.W.2d 126, 138–39 (Tex.Cr.App. 1992) (Clinton, J., dissenting). As in *Nelson*, the Court today "sanctions jury confabulation; plugging evidentiary gaps with speculation about what might have happened that is at least consistent with what the State *has* proved. But confabulation is not itself proof." *Id.*, at 139. For this reason I am inclined to hold the evidence insufficient to establish the requisite specific intent.

When it comes to the *mens rea* element of an offense, however, this Court has effectively excused the State from this burden of production. In *Matson v. State*, 819 S.W.2d 839, 843–46 (Tex.Cr.App.1991), the Court held that the former "reasonable alternative hypothesis" method for analyzing sufficiency of the evidence, rejected in *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App.1991), had never in any event applied to appellate review of sufficiency of the evidence to prove a culpable mental state. In essence this means that if all of the State's circumstantial evidence, viewed in the light most favorable to the verdict, is consistent both with a culpable mental state and a non-culpable mental state, but does not lead a rational jury to prefer one theory over the other, we will nevertheless hold the evidence sufficient. The notion seems to be that when it comes to proving what is in the mind of a criminal, it would just be too onerous to hold the State to its full, albeit constitutionally mandated, burden of proof. *Matson*, supra, at 846.

Writing for a plurality of the Court in *Brimage*, I deferred to *stare decisis* and held the circumstantial evidence sufficient, despite the fact there was nothing in the evidence to lead a rational jury to prefer the theory that Brimage harbored a specific intent to prevent liberation over the theory that he simply meant to sexually assault his victim and then immediately kill her. Slip op. at 13–14 & n. 9, —— S.W.2d at —— —— & n. 9. For this proposition I cited *Matson*. Given the ghastly nature of crimes like Brimage's and appellant's, it is oftentimes tempting to relieve the State of its burden to prove the full capital component of an offense; to join, as it were,

in the collective retributive impulse. Alas, as judges—even as popularly elected judges— we do not enjoy that liberty. In my view *Matson* legitimates that retributive impulse, and we should re-examine it.

## II.

The instruction given by the trial court in this cause in an attempt to satisfy the Eighth Amendment limitations of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), is identical to that given by the trial court in *Riddle v. State*, 888 S.W.2d 1 (Tex. Cr.App.1994). The majority in *Riddle* held it to be a sufficient *Penry* instruction, likening it to one we had earlier approved in *Fuller v. State*, 829 S.W.2d 191, 209 (Tex.Cr.App.1992). In my concurring opinion in *Riddle* I disagreed, pointing out that the instruction was much more like the one we expressly disapproved in *Rios v. State*, 846 S.W.2d 310 (Tex.Cr.App.1992). I nevertheless concurred in the result in *Riddle* because there the defendant failed "to identify any mitigating evidence that either cannot be accounted for in mitigating fashion within the confines of the special issues, see *Johnson v. Texas*, 509 U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993), or that this Court has seen fit to agree has mitigating significance apart from the special issues." 888 S.W.2d at 9. I cannot say the same thing here. Thus I dissent to the Court's disposition of appellant's second through fifth points of error. Maj. op. at 575–576.

At the punishment phase of trial appellant adduced evidence that from his earliest childhood he was beaten and abused by his natural father, and by a succession of alcoholic stepfathers, usually after trying to save his mother from a similar fate. This exposure to violence, according to Dr. Wendell Dickerson, a forensic psychologist, in combination with substance abuse, produced in appellant an antisocial personality disorder. Another psychologist, Dr. Jerome Brown, affirmed that "there is a cause and effect relationship between [appellant's] upbringing ... and the fact that he's sitting here at counsel table today[.]" This level of childhood abuse and its formative effect on appellant's personality can only have aggravating significance as it

relates to the special issues under former Article 37.071, V.A.C.C.P. And it clearly has mitigating significance *apart* from the special issues. Moreover, appellant has even adduced evidence of so-called "nexus." See *Goss v. State,* 826 S.W.2d 162, 165–66 (Tex. Cr.App.1992). The Eighth Amendment prohibits execution of appellant in the absence of jury consideration of the mitigating impact of this evidence. *Gribble v. State,* 808 S.W.2d 65, 75 (Tex.Cr.App.1990).

For reasons given in *Rios* and in my concurring opinion in *Riddle,* the instruction appellant got was not adequate. The Court should at least vacate the judgment of the trial court and remand the cause for a new punishment hearing under Article 44.29(c), V.A.C.C.P. Because the Court does not, I respectfully dissent.