Opinion filed April 26,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-10-00109-CR

                                                    __________

 

                        STEPHEN
DWAYNE WALLACE, Appellant

 

                                                             V.

 

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 217th District Court

                                                          Angelina
County, Texas

                                                     Trial
Court Cause No. 29,052

 



 

                                            M E M O R A N
D U M   O P I N I O N

 

            The
jury convicted Stephen Dwayne Wallace,[1]
appellant, of the offense of aggravated kidnapping.  Appellant pleaded true to the
enhancement allegations, and the jury assessed his punishment at confinement
for life and a fine of $2,500.  We affirm.  

Issues

            Appellant
presents two issues on appeal.  In the first issue, appellant challenges the
legal sufficiency of the evidence to support his conviction.  In his second
issue, appellant argues that the trial court abused its discretion during the
punishment phase of trial by allowing gang-related evidence.  

Sufficiency
of the Evidence

            Appellant
asserts that the evidence is insufficient to show that appellant had the intent
to abduct, restrain, injure, or terrorize Julie Robinson.  We review a challenge to the sufficiency of the evidence,
regardless of whether it is denominated as a legal or a factual sufficiency challenge,
under the standard of review set forth in Jackson v. Virginia, 443 U.S.
307 (1979).  Brooks v. State, 323 S.W.3d 893, 912 (Tex. Crim. App.
2010); Polk v. State, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010,
pet. ref’d).  Under the Jackson standard, we examine all of the
evidence in the light most favorable to the verdict and determine whether,
based on that evidence and any reasonable inferences from it, any rational
trier of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Jackson, 443 U.S. at 319; Isassi v. State, 330 S.W.3d 633, 638 (Tex.
Crim. App. 2010).  

            Appellant was charged with and convicted of the
offense of aggravated kidnapping under Tex.
Penal Code Ann. § 20.04 (West 2011) for intentionally or knowingly
abducting Julie Robinson, without her consent, with the intent to terrorize her
or inflict bodily injury on her.  As relevant to this case, “abduct” means to
restrain a person with the intent to prevent the person’s liberation by
secreting or holding the person in a place where she is not likely to be found. 
Id. § 20.01(2)(A).  “Restrain” means “to restrict a person’s
movements without consent, so as to interfere substantially with the person’s
liberty, by moving the person from one place to another or by confining the
person.”  Id. § 20.01(1).          Restraint is without consent if it is
accomplished by force, intimidation, or deception.  Id. § 20.01(1)(A).  The
jury was charged accordingly and was authorized to convict appellant as either
a principal or a party to the offense.

The record shows that appellant and Robinson had been in a
romantic relationship but that, on June 22, 2009, Robinson had decided to leave
appellant.  Robinson made arrangements to go stay with her best friend,
Jennifer Holliday.  Holliday’s aunt, Robin Franklin, picked Robinson up and
took her to Holliday’s house.  Before they arrived at Holliday’s house, appellant
called and talked to both Franklin and Robinson.  Robinson testified that
appellant sounded really upset and agitated.  He was yelling, crying, and
saying, “You ain’t going to leave me like that.”  Robinson told appellant that
she was not leaving him.  When Robinson and Franklin got to Holliday’s house, a
silver Crown Victoria that appellant had been driving was in Holliday’s
driveway.  Franklin passed the house, and Robinson screamed at Franklin to go back,
which she did.  Ashley McLemore and Stephanie Powell were sitting in the Crown
Victoria.   Inside the house were Holliday, her son, her boyfriend, her
roommate, Christopher Guffey (“Kidd”),[2]
and a man whom Robinson did not know at the time but later learned that his
name was Gary Allen (“Lucky”).  Shortly after Robinson arrived at Holliday’s
house, appellant and Rachel Tutt called Holliday’s phone.  Robinson testified
that Tutt was making threats.  Robinson described Tutt—who had been appellant’s
best friend but had become romantically involved with appellant—as “evil.”  Robinson
again talked to appellant on the phone and tried to calm him down.  Although
she would rather have stayed at Holliday’s, she told appellant she was coming;
she felt intimidated and was afraid for the safety of Holliday and Holliday’s
son.  She got into the Crown Victoria and left with the group that had come to
Holliday’s house looking for Robinson.

            Franklin testified that, around 9:00 or 10:00
p.m. on June 22, 2009, Robinson called her and asked for a ride to Holliday’s
house.  While Franklin was on her way to meet Robinson, appellant called
Franklin.  Franklin testified that appellant was looking for Robinson and
stated, “I’ll be damned if she’s going to leave me with just a note.”  Franklin
said that she told appellant to leave Robinson alone and that appellant replied,
“You’re lying, bitch.  I’ll kill your ass.”  Robinson was shaking and crying
when she got into Franklin’s car.  Franklin proceeded to Holliday’s house but
drove past it because of the commotion going on there.  After they passed
Holliday’s house, Guffey called Robinson.  Franklin could hear Guffey
threatening, “Get back up here or somebody’s going to get hurt.”  Robinson told
Franklin to go back to Holliday’s house, saying, “They’ll hurt her.  They’ll
hurt her.  Just go back.  Somebody’s going to get hurt.”   Franklin turned
around and went back.  When Franklin pulled into Holliday’s driveway, Guffey
ran up to Franklin’s car, yanked open the passenger door, yanked Robinson out
of the car by her hair, and threw her to the ground.  Guffey then jumped in the
car, grabbed and twisted Franklin’s arm, and told her she was not leaving until
appellant got there.  Guffey was trying to grab Franklin’s keys.  About that
time, “Lucky” ran outside and said that he thought Holliday had called the
police.  “Lucky” grabbed Robinson and put her into the backseat of the Crown
Victoria.  Guffey’s phone rang; it was appellant calling.  Franklin could hear
appellant screaming over the phone.  Guffey told appellant, “We’ve got her. 
We’ve got her.”  Appellant replied, “Bring her to me.”  Guffey asked appellant
what to do about the rest of the people at Holliday’s house, and appellant said,
“Take them out.  Take them all out.”  Guffey got out of Franklin’s car and
threw Robinson, who had jumped out of the Crown Victoria, back into the Crown
Victoria again.  They left.  Franklin testified that she was terrified, “scared
to death,” and that she was afraid “they” were coming back to burn the house
down with Holliday and her son in it as “they” had threatened to do.  Based
upon what she observed, Franklin testified that Robinson did not want to leave
with Guffey and the others in the Crown Victoria and that she did not “go on
her free will.”  Franklin also testified that appellant was “[m]ad as hell” and
“furious” because Robinson had left.

            Holliday testified that she got a call from
appellant sometime during the evening of June 22, 2009.  Appellant was
looking for Robinson, and he was “mad and angry.”  After Holliday’s aunt,
Franklin, left the house to get Robinson, Holliday heard a “big bang c[o]me
through the door.”  Guffey and a man whom she had never seen before (but heard
others call him “Lucky”) had “stomped [her] door open.”  They were there to get
Robinson, and they accused Holliday of hiding her.  The two men told Holliday
and the others at her residence to put their cell phones on the table and not
to move.  Holliday was “very scared.”  Guffey was talking on the phone to
appellant and Tutt.  According to Holliday, Guffey was not acting on his own
accord.  Holliday heard appellant telling Guffey what to do the whole time he
was there.   Appellant kept saying, “Get Julie [Robinson], find Julie.  She’s
there.”  Holliday also heard appellant screaming, “[T]ake ’em out, take ’em
out, take ’em out.”  Guffey said he would not leave without Robinson.  When
Robinson arrived at the house, Guffey went outside and “put” Robinson into a
Crown Victoria.  Guffey threatened to burn Holliday’s house down with her son
in it if she called the police.  Guffey and the others who had arrived in the
Crown Victoria left and took Robinson with them.  Holliday took her son to her
grandmother’s house, waited on her mother to come get her, and then went to the
sheriff’s department and reported the incident.  Holliday testified that
Robinson was scared and did not leave voluntarily but that those people were
not going to leave unless Robinson went with them.  Holliday testified that she
did not associate with appellant or Guffey and that she did not approve of
Robinson’s association with them.  Holliday’s roommate testified similarly to
Holliday regarding the events that occurred that night and agreed that Robinson
seemed to be scared.

Robinson testified that, after leaving Holliday’s house in
the Crown Victoria, they drove around while Guffey was talking on the phone to
either appellant or Tutt.  One of them told Guffey to put Robinson in the trunk;
Robinson believed it was appellant who was giving the order to put her in the
trunk.  They pulled over, and Guffey and McLemore got out of the car.  
McLemore rearranged the stuff that was in the trunk.  Then Guffey reached in,
grabbed Robinson, and put her in the trunk.  They drove to a Shell station.  At
the station, the trunk popped open and appellant was standing there.  Appellant
said, “Bitch, you got me f----d up.  You ain’t going to leave me like that.” 
The trunk was shut and then opened again.  Tutt was standing there; she grabbed
Robinson’s hair, said something, and then the trunk was shut again.  They left
the station but stopped a short distance away.  When they stopped this time,
appellant yanked Robinson out of the trunk by the back of her head and her
pants, threw Robinson down on the road, kicked her into the ditch, picked her
up, and put her in the backseat of the little red car that appellant was
driving.  They drove for a while with appellant driving and Tutt in the
passenger seat.  Appellant kept yelling at Robinson and asking her questions. 
At one point, he reached back to hit Robinson but could not really hit her
because he was driving.  Tutt took over as the driver, and appellant got in the
backseat with Robinson.  Appellant got more and more upset and “just kept
hitting” Robinson.  Tutt was provoking things.  Robinson pleaded with appellant
and told him that she loved him, but appellant’s demeanor did not change.

Appellant told Tutt to drive to the cemetery.  The Crown
Victoria had followed them there.  Both cars pulled into the cemetery and
stopped, and everybody except for Powell got out.  Appellant continued hitting
her after they got out of the car.  He knocked her to the ground several
times.  As a result of the beating from appellant, Robinson had a busted left
eardrum, some blood on the brain, a broken tooth, a missing tooth, some bald
spots on her head, scratches, and bruises.  The beating was interrupted when
somebody saw car lights.  Robinson kept losing consciousness.  She next
remembered being in the red car with appellant, Tutt, and Guffey.   They drove
around for a while and eventually went to Tutt’s parents’ house.  While there,
appellant and Robinson talked some more.  Appellant ultimately decided that
Robinson had set him up, and he told her that they “were going to have to kill”
her.  Tutt, appellant, and Robinson left in the red car.  Robinson was afraid;
appellant had told her that Tutt was going to kill her. Instead, they drove
around, talked some more, and returned to Tutt’s parents’ house.  Robinson fell
asleep.

Guffey woke Robinson up, handed her the phone, and told her
that somebody from the sheriff’s department wanted to talk to her.  It was Deputy
Donna Clayton calling to check on Robinson.  Both Robinson and appellant talked
to Deputy Clayton.  They told Deputy Clayton that Robinson was okay and that
she would come to the department to prove that she was okay.  There were
several phone calls back and forth between Deputy Clayton and appellant and
Robinson.  During one of the phone conversations between Robinson and Deputy
Clayton, Robinson was being asked “yes or no” questions and was able to inform
Deputy Clayton that she was hurt.  Tutt’s mother refused to take Robinson to
the sheriff’s department.

They left Tutt’s parents’ house.  Powell, Tutt, and
appellant left in the red car.  Guffey, “Lucky,” McLemore, and Robinson left in
the Crown Victoria.  Guffey drove the Crown Victoria, following the red car at
that point.  They were not headed in the direction of the sheriff’s
department.  While they were driving, a police car began following them with
its siren and lights turned on.  Guffey sped up.  He also slammed on the brakes
a couple of times.  At some point, Guffey “sort of pulled over.”  Everybody
jumped out of the Crown Victoria, and everyone except for Robinson took off
running.  Robinson requested to be taken into custody and put in a police car.

Based upon Holliday’s report and Deputy Clayton’s phone
conversations, law enforcement officers were dispatched to look for the Crown
Victoria.  Detective Tom Matthews spotted the Crown Victoria and the red car.  The
cars were not headed toward the sheriff’s department when they were
intercepted; instead, they were traveling in the opposite direction. Guffey was
driving the Crown Victoria, and Robinson was in the backseat.  Detective
Matthews turned on his lights and siren and attempted to stop the Crown
Victoria, but Guffey sped up and, at one point, slammed on his brakes and then
sped back up.  After a five-mile pursuit, Guffey stopped.  All of the people in
the Crown Victoria, except for Robinson, fled.  Lieutenant Bryan Holley of the
sheriff’s department arrived at the scene about ten or fifteen seconds behind
Detective Matthews.  Robinson asked Lieutenant Holley to handcuff her and put
her into the police car where she would be safe.  Lieutenant Holley obliged and
then transferred custody of Robinson to Deputy Clayton when she arrived.  Shortly
thereafter, Lieutenant Holley spotted the red car nearby.  He saw a female
driving and a female in the backseat and noticed that the front passenger seat
was laid back.  Then, he observed “a silhouette of a male” raise up to see what
was going on.  Lieutenant Holley turned on his lights and siren and stopped the
red car.  Appellant, who had been in the front passenger seat, fled into the
woods.  Appellant was arrested about two hours later.

When Deputy Clayton arrived at the scene, Robinson was almost
hysterical.  Robinson said that she had been kidnapped and was in fear for her
life, and she asked Deputy Clayton to please keep her and her children safe.
Robinson showed visible signs of physical abuse.  Deputy Clayton took
pictures of Robinson’s injuries.  At trial, Deputy Clayton described the
injuries (as did Robinson), and numerous pictures showing the injuries were
admitted into evidence.

Appellant urges that the evidence is insufficient to
support his conviction because the evidence failed to show that appellant had
the intent to injure Robinson, because the evidence showed that Robinson
voluntarily got into the car and into the trunk, because the credibility of some
of the witnesses was questionable, and because there were inconsistencies in
the evidence.  First, after reviewing all of the evidence, we cannot hold that
the evidence is insufficient based upon the relatively minor inconsistencies to
which appellant refers in his brief or upon any witness’s credibility or lack
thereof.  The jury, as the trier of fact, was the sole judge of the
credibility of the witnesses and of the weight to be given to their testimony. 
Tex. Code Crim. Proc. Ann. art.
36.13 (West 2007), art. 38.04 (West 1979).  As such, the jury was free to
believe or disbelieve all or any part of any witness’s testimony.  Sharp v.
State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  Next, with respect to appellant’s contention that Robinson went
with him voluntarily, we conclude that there is more than ample evidence from
which a rational jury could have determined beyond a reasonable doubt that
Robinson did not voluntarily go with appellant or Guffey, that Robinson’s
restraint was accomplished by force or intimidation, and that Robinson was
abducted.  Finally, from the evidence presented at trial, the jury could have determined
beyond a reasonable doubt that appellant had the intent to inflict bodily
injury or to terrorize Robinson or that appellant acted as a party to the
offense.  We hold that any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt and that the
evidence is sufficient to support appellant’s conviction.  Appellant’s first
issue is overruled.

Gang-Related
Punishment Evidence

            Appellant
urges in his second issue that the trial court abused its discretion in
admitting gang-related evidence during the punishment phase of trial.  The
record shows that Deputy Clayton testified, without objection, regarding the
Aryan Brotherhood of Texas and appellant’s affiliation with that group.  She
testified that that organization is a Texas prison gang that was originally
organized to protect its members while in prison but that the organization is
involved in various criminal activities outside of prison to support each
other, such as drug trafficking, theft, and burglary.  Photos of appellant’s
numerous, Aryan-Brotherhood-related tattoos were admitted into evidence.  Deputy
Clayton testified that appellant claimed to be a captain in the Aryan
Brotherhood of Texas.

The
State asserts that appellant failed to preserve this issue.  We agree. 
Appellant made no objection at trial to the admission of the photos or to
Deputy Clayton’s testimony.  Consequently, he failed to preserve his contention
for review.  Tex. R. App. P.
33.1; Dinkins v. State, 894 S.W.2d 330, 354–55 (Tex. Crim. App. 1995).  Moreover,
the evidence showed that appellant was a member of the Aryan Brotherhood of
Texas and that the Aryan Brotherhood of Texas was involved in criminal
activities.  Consequently, the trial court did not abuse its discretion in
admitting the evidence.  See Mason v. State, 905 S.W.2d 570, 576–77
(Tex. Crim. App. 1995); Beasley v. State, 902 S.W.2d 452 (Tex. Crim.
App. 1995); see also Dawson v. Delaware, 503 U.S. 159, 165­–68 (1992). 
Appellant’s second issue is overruled.    

This
Court’s Ruling

            The
judgment of the trial court is affirmed.

 

 

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

April 26, 2012

Do not publish. 
See Tex. R. App. P.
47.2(b).

Panel consists of: Wright, C.J.,

McCall, J., and Kalenak, J.









[1]We note that the indictment reflects appellant’s name
to be Stephen Dwayne Wallace but that the judgment shows it to be Stephen
Wallace.





[2]We note that, in a separate trial, Guffey was also
convicted of the aggravated kidnapping of Robinson and also received a life
sentence.  We have this same day affirmed Guffey’s conviction.  See Guffey
v. State, No. 11-10-00106-CR (Tex. App.—Eastland April 26, 2012, n.p.h.)
(mem. op., not designated for publication).