


# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. AP-76,600

TEDDRICK BATISTE, Appellant

v.

THE STATE OF TEXAS

ON DIRECT APPEAL FROM THE 174TH JUDICIAL DISTRICT COURT
HARRIS COUNTY

**COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, and ALCALA, JJ., joined. KEASLER, J., concurred. MEYERS and HERVEY, JJ., did not participate.**

## OPINION

In June 2011, a jury convicted Teddrick Batiste of capital murder for the robbery and murder of Horace Lee Holiday.[1] Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge

[1] TEX. PENAL CODE § 19.03(a)(2).

sentenced Batiste to death.[2] After reviewing Batiste's twenty-two points of error on direct appeal, we conclude that they are without merit. Accordingly, we affirm the trial court's judgment.

**Background**

In the early morning hours of April 19, 2009, appellant, a member of the Five Deuce Hoover Crips, was at home getting some tattoos, when he looked in the mirror, thinking about all of his bills. He asked his friend, Loc, to "ride around" in his Buick with him looking for something to steal because "that's the way you get money." After fruitlessly cruising the streets for a while, they ended up at an after-hours club on Veteran's Memorial Drive on the north side of Houston. Appellant saw a white Cadillac coming out of the parking lot, and he decided that he wanted the Cadillac's fancy rims. "I just look at the rims, and I know what the rims are worth. . . . I could get $3,000 on the streets."

Appellant started following the Cadillac, and they drove for miles down the freeway. Eventually the driver must have noticed him, because the Cadillac began "swanging" from the right to the left lane and back again. Appellant was scared because the driver was acting "street smart," but he didn't want to show any fear because he and Loc were Crips, so he told Loc to lean back while appellant pulled up even with the Cadillac and started shooting at the driver through Loc's passenger window. He shot the driver four or five times with his nine-millimeter, semi-automatic Glock pistol.

---

[2] TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

The Cadillac exited the freeway, pulled into an Exxon station, and ran into one of the gas pumps. Appellant drove into the station and saw the badly wounded driver slowly come out of the Cadillac, crying "Help, help, help." The man collapsed on the concrete. Appellant thought, "[M]an, this is my chance. I got to get those wheels. . . . And I got my gun, and I put my hat on, and I had a ski mask." He told Loc to drive the Buick to appellant's wife's apartment, and then appellant ran over to where Mr. Holiday, the driver, was lying on the ground. When he saw the man move, he shot him several more times in the back and head. Mr. Holiday died.

Appellant jumped into the Cadillac and drove out of the Exxon station and back onto the Eastex freeway, heading north. He soon noticed a police car behind him and realized that he would be caught, but first he led the pursuing officers on a high-speed chase for about twelve miles. It was not until officers placed a spike strip across the road and appellant ran over it, destroying the Cadillac's passenger-side tires, that he was finally forced to stop.

Appellant was taken into custody and placed in a patrol car. One officer, who had noticed a great deal of blood on the Cadillac's steering wheel and driver's seat, came over to ask appellant if he needed medical attention. Appellant told him that he was "fine"; it wasn't his blood, it "belongs to the guy I took the car from." After appellant was taken to the homicide division, he gave officers a recorded statement confessing to the capital murder of Horace Holiday. He then gave two more confessions–one to a second capital murder and

one to a separate aggravated robbery.[3]

The jury found appellant guilty of capital murder. During the punishment phase, the State offered evidence that, on March 23, 2009 (a little more than three weeks before killing Horace Holiday), appellant robbed Walter Jones, his wife, Kari, and David McInnis, at the Phat Kat Tats tattoo shop. A little before 11:00 p.m., appellant parked his Buick in front of the Shipley's Donuts shop in the strip center where the tattoo shop was located. Then he and two cohorts marched into the shop, wearing blue bandanas over their faces and carrying semi-automatic pistols. Appellant screamed, "This is a fucking robbery!" Each of the robbers grabbed one of the three adults, and each put a gun to that person's head. Walter Jones, the owner of Phat Kat Tats, noticed that these robbers were well organized and likely had done this before. Kari, very afraid that their five-year-old son might come into the shop from the next room, pleaded with the robbers not to shoot him if he did so. One of the robbers started yelling at her, "Shut up, bitch, I'll kill you, I'll kill you. Shut up." The robbers made them empty out their pockets. Disappointed with the result, the robbers then scooped up two laptops, several cell phones, a digital camera, and three tattoo machines. They ran out of the shop and fled in appellant's Buick. The surveillance camera at the nearby Shipley's Donuts caught appellant, his cohorts, and the Buick, on tape.

Two weeks later–shortly after midnight on April 8, 2009–appellant drove his Buick through the strip-mall center where the Black Widow tattoo parlor was located. He was

---

[3] Evidence of those separate crimes was introduced only at the punishment phase of the trial.

"casing" it for a robbery. He backed his Buick into a parking slot in front of the shop, and then he and two other men walked into the tattoo parlor. Steve Robbins, the shop's owner, was tattooing Joshua's arm, while two of Joshua's friends–Anthony and Christie–were napping on the couch. Two of the robbers held Anthony and Christie at gunpoint, while the third robber went toward the back where Steve was tattooing Joshua. Appellant and the other two robbers were yelling and "cussing" at everyone, demanding money and wallets. When Steve told the robbers that they had gotten all the money and they should leave because the store had surveillance cameras, appellant turned back to him and said, "What, mother-fucker?" and began shooting Steve. Appellant and another robber shot a total of sixteen bullets before they finally fled in appellant's Buick. Steve died.

The State also introduced evidence of appellant's long criminal history, his gang-related activities, and his various acts of violence and intimidation while in jail.

Horace Holiday's mother, Lisa Holiday Harmon, gave the jurors a brief glimpse into her son's life and how he had saved up the money to buy the special rims for his Cadillac just two weeks before his death. She told the jury that, after the murder, Horace's grandmother moved into Horace's old room to be closer to his memory. Horace's grandmother testified that, after Horace's death, the "whole family fell apart."

During his punishment case, appellant called a dean from the University of Houston to testify to the TDCJ inmate classification system and life in prison. He also called a high-school track and football coach who said that appellant was a gifted athlete in middle school,

but that he "disappeared" after he got into trouble for car thefts. Appellant's former boss testified that appellant worked at Forge USA for over six months as a helper on the forging crew. He never had any problems with appellant. Appellant's girlfriend, Stephanie Soliz, testified that she and appellant lived together with her two children, one of whom was fathered by appellant. Appellant was "the best" father. Stephanie admitted that they smoked a lot of marijuana at home and that appellant had a second job as a "fence" for stolen property. She was "okay" with appellant selling stolen property, as long as he wasn't doing the stealing himself.

Appellant's younger brother, Kevin Noel, testified that appellant was "a very caring and loving brother." He did not try to get Kevin to commit crimes or join the Crips gang, but Kevin did join the Line Five Piru Bloods gang and has the gang's tattoos. Kevin would pick appellant up from work and bring him back to his apartment where Kevin smoked dope with appellant and Stephanie. Appellant would write him letters from jail suggesting various new gang tattoos and bragging about having sex with a nurse in the infirmary. Appellant also wrote a letter from the jail to a friend telling him that he had broken his hand fighting with "a white guy from the military." When that man had interfered with appellant's phone call, appellant broke his jaw.

Darlene Beard testified that appellant was her "favorite grandson." She took care of him until he was nine years old. After that, she saw him every Thanksgiving, and sometimes on her birthday or Mother's Day. She never saw appellant do anything bad. "I can only tell

you about the good things that I know concerning my grandchild." Mrs. Beard said that appellant has a "huge" family and does not have any conflict with any member of that family. Appellant's mother testified that she was barely sixteen when appellant was born, so her mother took care of him while she finished high school. He was a healthy, happy, church-going child without any mental-health or learning problems until he started getting into trouble in middle school. She knew that appellant was sent to TYC for stealing cars, but he never told her about his other crimes, being in a gang, or having gang tattoos.

Appellant testified that he had a happy childhood, but when he was in middle school, he began selling Ritalin because he wanted to make money. After he was caught, he was sent to an alternative school for the rest of eighth grade and half of ninth grade. Appellant said that, after TYC, he committed crimes "just like to keep money in my pocket, keep everything I needed." Appellant stated that he spent some of his money on marijuana for Stephanie and himself, but he didn't commit crimes to get drug money. He said that he really loves his two boys, Kash and Alex, and would guide them and tell them "what's right, what's wrong."

Appellant testified that he could be a positive influence on people in prison, and he would distance himself from the Crips members "and just pick different goals." Appellant stated that he had followed the jail rules "[t]o the best of my ability. . . . Everytime, it's always mutual combat. It's never been where I just hit somebody. I hit them back." But appellant did admit that, when faced with the choice to show empathy and help Horace Holiday, who was bleeding to death on the concrete, appellant made the choice to shoot him

several more times and steal his car.

When appellant was in jail, Stephanie tried to move on with a new boyfriend, Aaron. Appellant wrote rap lyrics about shooting him: "But Aaron ain't crazy, man. That nigga respect my game. He's a target up in my range. Extended clip to his brain." Appellant admitted that his jailhouse rap lyrics could be seen as glorifying capital murder ("I popped and he dropped"), the gangster lifestyle, and violence in general. Appellant agreed that he recruited the gang members for the Phat Kat Tats robbery and told them what to do. He admitted that he was the leader in the Black Widow capital murder as well. And he said that those were not his first robberies.

After deliberating, the jury answered the special issues in such a manner as to require the trial judge to sentence appellant to death.

**The Admission of Appellant's Blue Necklace**

In his first eight points of error, appellant complains that the trial judge erred in admitting into evidence, during the punishment phase, the blue necklace that appellant was wearing when he was arrested after murdering Horace Holiday. Appellant complains that its admission, and expert testimony about the necklace, (1) violated his right to the free exercise of religion under the federal and Texas constitutions, (2) was irrelevant under Article 37.071, (3) should have been excluded under Rule 403, and (4) was not properly authenticated. We reject these claims.

Neither the necklace, nor a photograph of it, is in the appellate record, but Clint

Ponder, a Houston Police Department gang officer, described the necklace as being light blue[4] with a "grim reaper" figure attached. Officer Ponder stated that it was a "Santa Muerte necklace," and he explained its significance:

> Santa Muerte is a saint that a lot of guys will worship to ward off the police or . . . different people worship it for different things, but in a criminal world, you see a lot of guys wearing these, drug traffickers wear necklaces or detailed [on] the back of their car or shrines in their apartment. And they pray to the saint for various reasons, but in the criminal world, it's to keep the cops away. If you're making a big drug run across the state, a big package of marijuana from one state to the next, you wear this in hopes that you get to your destination without the cops stopping you, but it's–in the criminal world, it's worn for that, to keep the police away and hope your criminal endeavor goes okay.[5]

This was the extent of the testimony about the necklace. Officer Ponder then spent more than twenty pages of testimony describing appellant's many gang-related tattoos and their significance. At trial, appellant's objection to the necklace and Officer Ponder's testimony about it was "relevance, [and] lack of foundation on the part of the witness. Not that they didn't try to get it in. And a 403 objection." Having failed to object on the basis of any First Amendment or religious issue, appellant failed to preserve his first three claims for our review.[6]

---

[4] Blue is the Crips's gang color. Appellant wore a blue bandana when he committed the aggravated robbery at Phat Kat Tats and he had that bandana with him when he shot Mr. Holiday in the head at the Exxon station. He also wore blue coverall Dickies during the aggravated robbery.

[5] Officer Ponder agreed that "non-gang members, non-criminals, also have items that might have Santa Muerte on them" and that "[n]ot everybody wearing a Santa Muerte is a criminal."

[6] TEX. R. APP. P. 33.1(a)(1)(A); *see Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (capital-murder defendant did not preserve claim that trial judge improperly refused to limit questioning of witness; point of error on appeal must correspond to objection at trial and objection

---

at trial stating one legal theory will not preserve a different legal theory on appeal) (citing *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990)). Even constitutional errors may be forfeited if not properly preserved at trial. *Id.*; *see generally Clark v. State*, 365 S.W.3d 333, 339-40 (Tex. Crim. App. 2012) (explaining rationale for contemporaneous-objection rule and requirement that complaint on appeal match objection at trial; defendant's objection of "badgering" witness did not preserve constitutional due-process claim).

Even if appellant had objected on a First Amendment basis, claiming that the admission of the necklace infringed upon his right to his free exercise of religion, the trial judge would not have abused his discretion in overruling that objection. At no time did the prosecutor or the gang expert suggest that appellant's necklace had any significance to the exercise of a bona fide religion. Its established relevance in criminal trials is to criminal street gangs and their "worship" of "Santa Muerte" or "Saint Death" who has been described as "the drug trafficker's god" and is "used as a protector of drug traffickers and, you know, [would] take care of their family." *Gonzalez v. State*, 984 N.E.2d 725, *2, *6 (Ind. Ct. App. March 8, 2013) (not designated for publication); *see also Mireles v. State*, No. 05-12-00040-CR, 2013 WL 226190, *4 (Tex. App.—Dallas Jan. 18, 2013) (not designated for publication) ("the State presented evidence that [defendant] is a follower of Santisima Muerte, or Santa Muerte, which is a religion, or cult, depicted by a skeletal figure resembling the 'grim reaper' and associated with drug traffickers and gangs"; expert witness said that "drug cartel members put the picture of Santa Muerte on kilos of cocaine to protect it."); *United States v. Felix*, 2013 WL 474542, *1 (D.C. Utah Feb. 7, 2013) (not designated for publication) (defendant, stopped for speeding, raised a "Santa Muerte" pendant to his lips and kissed it; officer knew that a "Santa Muerte" depicts the grim reaper, which he knew "was often worn by individuals involved in drug trafficking."); *United States v. Garcia*, ___ F. Supp. 2d ___, 2013 WL 210184, *2 (E.D. Tenn. Jan. 11, 2013) (officer exercised caution when interacting with defendant in his car because defendant was wearing "Santa Muerte" pendant which officer knew was "worn by members of drug distribution gangs in Mexico"; noting that "fairly or unfairly Santa Muerte has been adopted by members of Mexican drug cartels"); *United States v. Pena Ponce*, 588 F.3d 579, 582 (8th Cir. 2009) (officer knew that "Santa Muerte" statue that driver kicked under car seat "is commonly used by drug traffickers for protection"); *United States v. Beltran–Aguilar*, 412 Fed. Appx. 171 (10th Cir. 2011).

In one recent case, the federal district court rejected the defendant's claim that the admission of expert testimony about a "Santa Muerte" statue and its connection to drug trafficking should be excluded under either the First Amendment or Federal Rule of Evidence 403. *United States v. Goxcon–Chagal*, 885 F. Supp. 2d 1118, 1125 (D.N.M. 2012). The court noted that the government asserted that "Santa Muerte" is not a saint and is not recognized as such by the Catholic Church. Rather, it is a "narco-saint." *Id.* The court noted that various other courts have upheld the admissibility of expert testimony concerning "Santa Muerte" as a "tool of the trade of drug traffickers." *Id.* at 1146. And, after a lengthy analysis, the court held that the evidence and expert testimony about "Santa Muerte" did not infringe on religious freedom or violate the Establishment Clause. *Id.* at 1154-57. The court explained,

> While the religion associated with Santa Muerte is the only one that is at issue, the introduction of the evidence does not seek to punish [the defendant] for worshiping

We turn to appellant's preserved claim that the necklace and Officer Ponder's testimony were irrelevant under Article 37.071. Under that article, the trial judge may admit "evidence . . . as to any matter that the court deems relevant to sentence"[7] during the punishment phase of a capital-murder trial. Evidence of appellant's gang membership in the

---

> Santa Muerte, but only for having drugs in her possession. While worshipers of Santa Muerte are at a disadvantage because they may be suspected of and successfully prosecuted for drug activity more than non-worshipers of Santa Muerte, the presence of prayers and statues is not a necessary or sufficient condition for a criminal conviction.

*Id.* at 1157. The court elaborated on the defendant's "free exercise" claim:

> While it might be argued that the introduction of the Santa Muerte evidence places a burden on the exercise of her religion, it is incidental and not great enough to violate the Constitution. She is facing punishment for the drugs and gun found in her possession, not for her beliefs. Her religious beliefs are neither sufficient or necessary conditions for criminal punishment.

*Id.* at 1159; *see also United States v. Esquivel-Rios*, 2012 WL 1154508, *6 (D. Kan. April 5, 2012) (not designated for publication) (rejecting defendant's claim that evidence about his possession of a "Santa Muerte" book infringed upon his freedom of religion; "the evidence presented at trial did not go into the specific content of the book or Defendant's religion, but rather, that this sort of material is an artifact of the narco-traffic culture similar to a rabbit's foot."). Appellant has not cited or distinguished these cases.

In this case, Officer Ponder never referred to appellant's religious beliefs or affiliations; he simply stated that the Crips gang uses the color blue as was used in the necklace and that the "grim reaper" pendant is used by criminal gangs. The logical connection to be made is between "Santa Muerte" necklace and gang membership and criminal activities, not between wearing a "Santa Muerte" necklace and being religious or being Catholic.

In his third point of error, appellant complains that the trial judge erred in admitting other evidence of appellant's religious beliefs and practices from other witnesses, but he did not object to any of that testimony at trial. He has thus forfeited this complaint. TEX. R. APP. P. 33.1(a).

[7] TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1). *See Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010) (trial judge abuses his discretion in admitting evidence at punishment stage of capital-murder trial "only when his decision lies 'outside the zone of reasonable disagreement.'").

Five Deuce Hoover Crips criminal street gang was relevant and admissible,[8] as was evidence of his many gang tattoos,[9] as was the very brief description of the "Santa Muerte" necklace that he was wearing when arrested.[10] All of this evidence is indicative of the defendant's character and is relevant to the issue of future dangerousness.[11]

Appellant also argues that the admission of the necklace and expert testimony concerning its significance over his Rule 403 objection was error. Texas Rule of Evidence 403 provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"[12] The balance between

---

[8] *See Vasquez v. State*, 67 S.W.3d 229, 239-40 (Tex. Crim. App. 2002) (evidence of defendant's membership in the Mexican mafia admissible to show motive for gang-related murder and evidence of his tattoo was admissible to show gang membership); *Mason v. State*, 905 S.W.2d 570, 576-77 (Tex. Crim. App. 1995) (trial judge did not err by admitting evidence of the defendant's membership in the Aryan Brotherhood because that membership "was relevant to the issue of future dangerousness and [was] outside the protection of the First Amendment.").

[9] *Connor v. State*, 67 S.W.3d 192, 201-02 (Tex. Crim. App. 2001) (expert testimony in punishment phase of capital-murder trial explaining the significance of defendant's tattoos was "relevant to defendant's character and hence to punishment.").

[10] *Davis*, 329 S.W.3d at 806 ("Appellant's Satanic tattoo, books, writings, and drawings are indicative of his character, and we have held that such evidence is relevant to the question of future dangerousness at punishment."); *see also Goxcon-Chagal*, 885 F. Supp. 2d at 1146-48 ("Various district court judges in border states have permitted evidence regarding Santa Muerte and Jesus Malverde for the purpose of showing it is a tool of the trade of drug traffickers. . . . There is no reason to re-invent the wheel here: the reliability of expert testimony dealing with 'tools of the trade' has been well recognized by courts[.]").

[11] *See Davis*, 329 S.W.3d at 805-06; *Connor*, 67 S.W.3d at 201-02; *Mason*, 905 S.W.2d at 576-77; *see also Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996) (evidence of defendant's gang membership was relevant and admissible during punishment phase of capital-murder trial); *Gutierrez v. State*, AP-74,341, 2004 WL 3092763, *6 (Tex. Crim. App. April 21, 2004) (not designated for publication) (same).

[12] TEX. R. EVID. 403.

probative value and unfair prejudicial effect "is always slanted toward admission, not exclusion, of otherwise relevant evidence."[13] Furthermore, relevant evidence may be excluded only if the danger of *unfair* prejudicial effect *substantially* outweighs the probative value of the evidence.[14]

Appellant contends that the necklace and Officer Ponder's testimony were "used by the State to prove that Appellant is a criminal [who] planned on committing crimes the night he was arrested."[15] While appellant was arrested immediately after he had committed a capital murder, the State did not use the Santa Muerte necklace to prove that fact. The necklace was not even offered into evidence until the punishment phase. Although its probative value concerning appellant's character and gang membership was not particularly compelling–not nearly as compelling as the myriad gang tattoos on his body–it carried very little danger of unfair prejudice. There was little, if any, potential for testimony about the "Santa Muerte" necklace to impress the jury "in some irrational but nevertheless indelible

---

[13] *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (trial judge has great discretion in his Rule 403 balancing analysis; "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld.").

[14] When making a balancing analysis, the trial judge may consider various factors, including the following: (1) how compellingly the evidence serves to make a fact of consequence more or less probable, (2) the potential for the evidence to impress the jury in an irrational but nevertheless indelible way, (3) the time the proponent needs to develop the evidence, and (4) how much the proponent actually needs the evidence to prove a fact of consequence. *Powell v. State*, 189 S.W.3d 285, 287 (Tex. Crim. App. 2006). Appellant has not explained, either at trial or on appeal, how any unfair prejudicial effect of this necklace and Officer Ponder's testimony concerning its significance to gangs significantly outweighed its probative value.

[15] Appellant's Brief at 29.

way."[16] Further, the time spent discussing the necklace was one-twentieth the time spent on appellant's tattoos, which were a much more graphic display of appellant's criminal-gang affiliation. Finally, Officer Ponder's testimony that criminals use a Santa Muerte pendant or statue to ensure the success of their crimes and to ward off the police focused the jury's attention on the narrow "criminal gang" probative value of the evidence and away from any possible reference to religious faith or Catholicism.[17] The trial judge did not abuse his discretion in overruling appellant's Rule 403 objection.[18]

Appellant also complained at trial to the State's lack of foundation or authentication of the necklace. Under Rule 901,

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.[19]

As appellant acknowledges, authentication of a physical item may be accomplished by testimony from a witness with knowledge that the item is what it is claimed to be.[20] Appellant complains that Officer Ponder did not establish that appellant himself considered

---

[16] *Powell*, 189 S.W.3d at 287.

[17] Although the prosecutors emphasized appellant's character for violence and zeal for his "gangsta lifestyle" during their closing arguments, they never mentioned appellant's necklace.

[18] *See Davis*, 329 S.W.3d at 806; *De La Paz*, 279 S.W.3d at 343.

[19] TEX. R. EVID. 901(a).

[20] TEX. R. EVID. 901(b)(1); *see Angleton v. State*, 971 S.W.2d 65, 68 (Tex. Crim. App. 1998); *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.–San Antonio 2006, pet ref'd); *Hooker v. State*, 932 S.W.2d 712, 715-16 (Tex. App.–Beaumont 1996, no pet.).

the "Santa Muerte" necklace "a symbol of being a member of a 'Hispanic gang,' 'drug cartel,' or any other type of gang."[21] While appellant did not testify that his blue necklace symbolized his gang membership, he did testify extensively about his Crips membership and how he wore and carried distinctive blue attire–his blue bandana and his blue Dickies–to display his gang membership while committing crimes. He admitted that "some" of his rap lyrics glorify gang violence, even in jail.[22]

Appellant confuses the concept of authentication with that of relevance. Authentication deals simply with the question of whether this blue necklace–Exhibit 141–is the same item that was collected from appellant on the night that he murdered Horace Holiday. Under Rule 901, the proponent need not establish beyond all doubt that the item is what the proponent claims it is.[23] Instead, the trial judge must simply decide whether the

---

[21] Appellant's Brief at 31.

[22] One set of appellant's jail-house rap lines was as follows:

I run the pacc like a chief
supplyin all the gang and the heat.
We survive betta in the clutch
and live off the thin line in the street.
Still riden for them swangs. H-town thang.
Tint and bang off in the lane
putting diamonds in the grain.

[23] *See Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) ("In performing its Rule 104 gate-keeping function, the trial court itself need not be persuaded that the proffered evidence is authentic. The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic" under Rule 901); *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) ("The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been

proponent has offered sufficient information for the jury to reasonably conclude that the item is what the proponent claims it is.[24]

In this case, Deputy Campbell testified in the guilt phase that appellant was wearing the blue necklace–State's Exhibit 141–around his neck when he met with appellant in the police station interview room to photograph him, collect his clothes, and obtain swabs for forensic testing. He identified Exhibit 141 as the very same blue necklace that he collected from appellant. Then, during the punishment phase, Officer Ponder testified and identified Exhibit 141–the blue necklace that came from appellant–as a "Santa Muerte" necklace, one favored by criminals to ensure success and ward off the police. It was at that point that the State offered the necklace into evidence and the trial judge admitted it over appellant's objection. Appellant does not dispute that Exhibit 141 is genuine–that is it the blue necklace that appellant was wearing on April 19, 2009. His concerns are focused only on its relevance, an issue that we have already addressed.

In sum, appellant has failed to show that the trial judge abused his discretion in admitting Exhibit 141, the blue necklace that appellant was wearing when he killed Horace Holiday, along with Officer Ponder's brief testimony concerning the significance of that necklace.[25] We therefore overrule points of error one through eight.

---

authenticated or identified.").

[24] *See Tienda*, 358 S.W.3d at 638; *Druery*, 225 S.W.3d at 502.

[25] *See Tienda*, 358 S.W.3d at 638; *Davis*, 329 S.W.3d at 806; *De La Paz*, 279 S.W.3d at 343; *Mason*, 905 S.W.2d at 577.

**The Presence of the Deceased's Family Members in the Courtroom**

In points of error nine through eleven, appellant claims that the trial judge erred by allowing Mr. Holiday's family members to sit in the courtroom during the guilt stage of the trial. He argues that the failure to exclude the family members under Rule 614 resulted in "emotional outburst[s] and disruptions" that violated appellant's rights to confrontation and due process.

Before trial began, the prosecutor requested that the trial judge permit Mr. Holiday's mother, grandmother, and uncle to remain in the courtroom during the guilt phase because none of them would be testifying during that stage of the trial and none had any first-hand knowledge about Mr. Holiday's murder. The prosecutor explained that Rule 614 explicitly permits the victim in a criminal case to be exempted from the rule of sequestration ("The Rule") "unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial."[26] Although Mr. Holiday's family members were not literally "victims" under Rule 614, the prosecutor argued that the rationale for the rule's exemption applied to them.

The defense objected and asked that all family members be excluded because they would likely become emotional.

> I don't see any way in a capital murder case that [having family members in the courtroom] can be appropriate. . . . There's no way we can get through this trial without there being emotion out there. The jury is going to be looking

---

[26] TEX. R. EVID. 614(4).

> over at these people. They're going to recognize them once they leave the witness stand.[27]. . . And there isn't any way it can have anything but a detrimental impact. Why don't we put them in the jury box and let them do the voting? That's what we're doing when we're leaving them in the courtroom. Just can't do it.

The trial judge overruled the objection and permitted the three family members to remain in the courtroom. Once, during the testimony of Dr. Chu, the medical examiner who performed the autopsy on Mr. Holiday's body, and again, when a deputy displayed pictures of the Cadillac with the interior covered in Mr. Holiday's blood, the family members shed tears in the courtroom.[28] The defense noted their emotion for the record and claimed that their continued presence "just isn't fair."[29] However, the only remedies that appellant

---

[27] Mr. Holiday's mother and grandmother were the last witnesses for the State during the punishment phase of trial.

[28] The prosecutor asked that the record reflect her evaluation of the family's reaction to the gruesome photographs and testimony:

> I'm having the opportunity to observe the family right now and I don't see any undue emotion being exhibited. And I would like that to be clear for the record. I've heard a couple of sniffles, but I've not seen crying to the degree that was expressed by [defense counsel].

[29] The record also shows that, during appellant's punishment-phase testimony, an unidentified spectator said "Amen" after the prosecutor asked appellant: "If you were scared [during the Black Widow robbery and murder] why did you do this robbery in the first place?" We will not presume that the unknown spectator was one of Mr. Holiday's family members. After all, this comment was made during testimony about an entirely different capital murder involving a different victim. The defense did not object to this interjection, and thus we will not consider this incident as a part of appellant's claims. TEX. R. APP. P. 33.1(a)(1)(A). For inflammatory conduct or an outburst by a spectator to be grounds for error, the appellant has the burden to ensure that the objectionable activity is described and made a part of the complete record so that any error is preserved for appeal. *See Baker v. State*, 797 S.W.2d 406, 408 (Tex. App.–Fort Worth 1990, pet. ref'd) (any error in failing to grant mistrial based on "inflammatory" conduct was waived because defendant failed to ensure that conduct was described in the record).

requested were the removal of the family members or a mistrial. A jury instruction was not requested. We have held that, in the context of an outburst by a bystander or witness, a trial judge's instructions are generally sufficient to cure any impropriety because it is presumed that the jury will follow those instructions.[30]

Appellant argues that Rule 614 prohibited Mr. Holiday's family members from being in the courtroom because they had been subpoenaed as possible witnesses. However, Article 36.03,[31] a statute enacted for precisely this situation, explicitly supercedes Rule 614 and requires a party opposing the presence of a victim's close family members in the courtroom to "make an offer of proof to justify the exclusion" of that person.[32] Of course, the trial judge

---

[30] *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010); *see also Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985) (despite "commotion in the audience" caused by deceased's wife as she "was in the process of fainting and leaving the courtroom" and "outcry" by victim's brother both within sight and hearing of jury during closing argument, defendant failed to show "how such emotional responses reasonably could have interfered with the jury's verdict"); *Sparks v. State*, No. AP-76,099, 2010 WL 4132769, *18 n.48 (Tex. Crim. App. Oct. 20, 2010) (not designated for publication) (despite audience member's crying and one victim's father "rush[ing] toward a break in the rail" separating the well of the courtroom from the audience during prosecutor's capital-murder punishment argument, disruption was not so great that it could not be cured by instruction to disregard; defendant failed to show that the outburst interfered with the jury's verdict).

[31] TEX. CODE CRIM. PROC. art. 36.03(a). That provision reads as follows:
Notwithstanding Rule 614, Texas Rules of Evidence, a court at the request of a party may order the exclusion of a witness who for the purposes of the prosecution is a victim, close relative of a deceased victim, or guardian of a victim only if the witness is to testify and the court determines that the testimony of the witness would be materially affected if the witness hears other testimony at the trial.

[32] *Id.* art. 36.03(b). That provision states,
On the objection of the opposing party, the court may require the party requesting exclusion of a witness under Subsection (a) to make an offer of proof to justify the exclusion.

still maintains the inherent authority to exclude a victim or victim's close family members if necessary to maintain courtroom decorum,[33] *i.e.*, if that person's conduct interferes with normal trial proceedings.[34]

In this case, appellant failed to make any offer of proof that the testimony of Mr. Holiday's family members "would be materially affected" by remaining in the courtroom during the guilt phase.[35] Even on appeal, appellant does not point to any testimony from the guilt phase that might have affected the very brief testimony during the punishment phase by Mrs. Harmon or Mrs. Holiday concerning the deceased.[36]

---

[33] *Id.* art. 36.03(c) ("Subsection (a) does not limit the authority of the court on its own motion to exclude a witness or other person to maintain decorum in the courtroom.").

[34] *See, e.g.*, *Landry*, 706 S.W.2d at 112 ("Conduct from bystanders which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict"; stating that defendant failed to show that "the emotional nature of family members throughout the trial" violated his right to a fair trial).

[35] *See, e.g.*, *Soria v. State*, Nos. 07-10-00161 to 00163-CR 2012 WL 1570969, *5 (Tex App.–Amarillo 2012, pet. ref'd) (not designated for publication) (relying on art. 36.03 and holding that, when defense failed to give the trial judge any basis for believing that child victim's testimony would be affected if she remained in the courtroom before she testified, trial judge did not abuse his discretion in allowing her to remain).

[36] Appellant also asserts that he was denied the right to confront and cross-examine Mr. Holiday's uncle because that family member never testified. The right to confront and cross-examine witnesses applies only to those who offer testimony or testimonial statements. *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004) (the Confrontation Clause requires that a defendant have the opportunity to confront the witnesses who give testimony against him). Mr. Holiday's uncle cannot be said to have "testified" against the defendant by sitting in the courtroom during public proceedings, even when he may have exhibited some emotion. Appellant cites no legal authority for his suggestion that "the presence and actions" of Mr. Holiday's uncle in the courtroom "were effectively testimonial." We are also unable to find any. This aspect of appellant's claim has not been adequately briefed and presents nothing for review. *See* TEX. R. APP. P. 38.1(I).

Appellant also claims that the testimony given by Mr. Holiday's mother was "impermissible

Instead, appellant argues that

> [a] distraught family in the courtroom during legal proceedings is salient and powerful. Counsel noted on the record that the jury was looking at the family. The family was essentially a continual and compelling exhibit being published to the jury.

That is one potential hazard in a society that cherishes the right to a public trial. The defendant in a criminal trial has the constitutional right to a trial that is open to the public;[37] and the public–including both the defendant's and victim's family members–also has a right to attend criminal trials.[38] As the Supreme Court has recently emphasized, "Trial courts are

---

victim impact testimony" because she told the jury that Mr. Holiday had saved his money to buy the wheel rims for his Cadillac and had bought them just two weeks before his murder. Appellant argues that her mention of Mr. Holiday's "hard work to save the money to buy the rims stood in obvious contrast to the evidence adduced by the State that Appellant had shot the complainant in order to steal those same rims" and he calls that "an impermissible use of victim impact evidence to compare the value of the complainant to other members of society." Appellant's Brief at 43. Appellant did not object on this basis, however; he objected on the basis of hearsay, but did not pursue his objection to a ruling by the trial judge. When appellant objected, the State agreed to ask a different question and the trial judge responded "Okay." Therefore, his hearsay complaint was not preserved for review. TEX. R. APP. P. 33.1. But even if it had been, any error in Mrs. Harmon's testimony of what her son told her about saving money for the wheel rims was harmless. TEX. R. APP. P. 44.2(b). And even if appellant had objected on the basis of comparing the relative merit of Mr. Holidays's hard work to buy these rims against appellant's "easy" work of stealing them, we have already held that this type of comparison is not forbidden. *See Jackson v. State*, 33 S.W.3d 828, 834 (Tex. Crim. App. 2000) (rejecting capital-murder defendant's argument that State is not permitted to compare the defendant's worth to the victim's worth because *Payne v. Tennessee* only "discourages 'measuring the worth of the victim compared to other members of society.'"); *see also Soffar v. State*, No. AP.-75363, 2009 WL 3839012, *50 (Tex. Crim. App. Nov. 18, 2009) (not designated for publication) (State's argument comparing the value of the deceased victims to that to defendant was not improper because the State did not compare the victims' worth to other members of society).

[37] *See Presley v. Georgia*, 558 U.S. 209, 212 (2010) (reaffirming the defendant's personal right to a public trial under the Sixth Amendment).

[38] *Id.* at 209 (trial court reversibly erred in excluding defendant's uncle from voir dire proceedings without seeking alternate methods to protect the right to a public trial); *see also Press-*

obligated to take every reasonable measure to accommodate public attendance at criminal trials." The Supreme Court explained the rationale for this rule:

> The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.[39]

The Texas Legislature has enacted a special crime-victim's statute to ensure that the family members of victims are entitled to attend the public proceedings of a criminal trial and cannot be excluded simply because they are family members and therefore might possibly become emotional. Article 56.02(b) states, "A victim, guardian of a victim, or close relative of a deceased victim is entitled to the right to be present at all public proceedings related to the offense, subject to the approval of the judge in the case."[40] Appellant correctly notes that Article 56.02(b) does not trump the sequestration rule, but Rule 614 does not trump Article 36.03, which explicitly permits close family members of a deceased victim to remain in the courtroom, even though they would otherwise be excludable under Rule 614.[41]

---

*Enterprise Co. v. Riverside Co.*, 464 U.S. 501, 508 (1984) (upholding the presumption of openness of all court proceedings, including voir dire, to all members of the public, including the press).

[39] *Press-Enterprise Co.*, 464 U.S. at 508.

[40] TEX. CODE CRIM. PROC. art. 56.02(b).

[41] Appellant cites and relies upon *Jimenez v. State*, 787 S.W.2d 516, 522-23 (Tex. App.–El Paso 1990, no pet.) (stating that article 56.02(b) did not authorize trial judge to exempt crime victim from "The Rule" in pretrial motion to suppress when it was her identification of the defendant that

Mr. Holiday's mother's right to remain in the courtroom during the guilt phase was not inviolate, but appellant was required to show, with an offer of proof, that her testimony would be materially affected by the testimony of other witnesses or that her exclusion was necessary to maintain courtroom decorum.[42] Appellant did not establish either of these. The mere fact that, at a couple of points during gruesome testimony, one or more of Mr. Holiday's family members were crying or sniffling does not show that the trial judge abused his discretion or that appellant was denied a fair trial. Even a disruptive outburst by a witness or other bystander "which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows a reasonable probability that the conduct

---

was the subject of the hearing; her description of defendant changed between the time of the pretrial hearing and the trial itself and made her in-court identification of defendant unreliable). However, that case involved the victim's hotly contested eyewitness identification of the defendant during the guilt phase, not brief victim-impact testimony during the punishment phase. Furthermore, *Jimenez* was decided before the enactment of Article 36.03, which explicitly trumps Rule 614.

[42] TEX. CODE CRIM. PROC. art. 36.03(a) & (b). Arguably Mr. Holiday's grandmother was excludable under Rule 614 because, under the literal terms of art. 36.03(a), a victim's grandmother does not meet the definition of "close relative of a deceased victim." *See id*. art. 36.03(d)(1) (using the definition for "close relative of deceased victim" found in art. 56.01, and that definition does not include grandparents of the deceased). Even if Article 36.03 did not apply to Mr. Holiday's grandmother and Rule 614 did apply, thereby making her excludable, there is nothing in this record to show that the trial judge abused his discretion in allowing her to testify despite a violation of The Rule. *See Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996) (trial judge's decision to allow testimony from a witness who has violated the rule is a discretionary matter. "It has been held that the ruling of the trial court on an objection to a witness testifying when he has remained in the courtroom after having been placed under the 'rule' may not be relied upon as a ground for reversal unless an abuse of discretion is shown; and until the contrary has been shown, it will be presumed on appeal that such discretion was properly exercised.") (quoting *Valdez v. State*, 776 S.W.2d 162, 170 (Tex. Crim. App.)). In this case, appellant has failed to show that Mrs. Holiday's testimony could have been affected by the testimony of witnesses during the guilt phase. Her testimony concerned only the loss of her grandson and how her family had been devastated by that loss.

interfered with the jury's verdict."[43]

Nothing in this record suggests that the jury could not (1) ignore those occasions when Mr. Holiday's family members showed some emotion or (2) fairly examine the evidence in arriving at a verdict.[44] We overrule appellant's points of error nine through eleven.

**Appellant's Proposed Jury Instructions**

In point of error twelve, appellant complains that the trial judge erroneously rejected his proposed jury instructions regarding victim-impact testimony. Appellant has cited no legal authority that would require (or even permit) the submission of such jury instructions under Texas law. We conclude that the trial judge did not err by declining to include appellant's requested instruction in the punishment jury charge.

During the jury-charge conference, appellant submitted a lengthy, three-paragraph proposed jury instruction concerning victim-impact evidence. In essence, it informed the jury that evidence had been introduced "for the purpose of showing the specific harm caused by" appellant's crime, but that the jury should not be diverted from its "proper role of deciding whether the Defendant should live or die."[45] The proposed instructions noted that

---

[43] *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (internal quotations omitted) (shouted outburst by one of the victim's family members during defendant's testimony that "You did this for $200?" did not require mistrial or reversal); *see also Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010) (one witness's outburst during her testimony that "I hate you for making me go through this again and my kids. You're mean," and another witness's outburst "You're an evil piece of shit" did not require mistrial or reversal).

[44] *Gamboa*, 296 S.W.3d at 580.

[45] The jury does not decide whether the defendant should "live or die"; it answers the special issues, and the trial judge then assesses punishment in accordance with those answers.

victim-impact evidence "is simply another method of informing you about the nature and circumstances of the crime," but that "[t]he sentence you impose must be in accordance with the law as I instruct you and not based on sympathy, prejudice, emotion or public opinion and not based solely upon victim impact."

We have previously rejected claims requesting jury instructions on victim-impact evidence,[46] and appellant does not persuade us that our prior decisions should be overruled. The trial judge submitted a charge consistent with the statutory requirements set out in the Code of Criminal Procedure.[47] We overrule appellant's twelfth point of error.

**"Execution-Impact" Evidence**

In his thirteenth through fifteenth points of error, appellant complains that the trial judge erred in not permitting him to introduce "execution-impact" evidence. As an offer of proof, the defense submitted a letter written by appellant's mother stating that her son did not deserve the death penalty and that "Killing Teddrick would be killing me." Appellant argues that the exclusion of testimony based on this letter violated his Eighth Amendment rights,

---

[46] *See Mays v. State*, 318 S.W.3d 368, 391 (Tex. Crim. App. 2010); *Saldano v. State*, 232 S.W.3d 77, 107 (Tex. Crim. App. 2007). In *Saldano*, we explained:

> We believe it sufficient to dispose of these points by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges. These state statutory provisions meet federal constitutional requirements by narrowing the class of "death-eligible defendants" and they arguably provide more than required by the federal constitution by providing a jury a vehicle to "fully" consider mitigating evidence "in every conceivable manner in which the evidence might be relevant.

*Id*.

[47] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)-(f).

denied him due process, and should have been admitted under Article 37.071.

Appellant's mother testified at trial, but appellant did not ask her questions to elicit all of the information contained in her letter.[48] The State notes that appellant did not make his request until after both sides had rested, the witnesses had been excused, and it was time for closing arguments. This was an untimely request, and appellant did not ask to reopen the testimony to recall appellant's mother to the witness stand.[49] Appellant did not preserve this

---

[48] Appellant's mother, Rowena Scott, cried while she testified about her son's birth and upbringing. She stated that appellant lived with his grandmother, who took care of him until he was about nine years old. Appellant had been born when Rowena was just sixteen, and she went back to school. She explained that appellant was a happy, healthy child who did not have any mental problems or learning disabilities. She sponsored the admission of numerous photographs of appellant taken at various ages in "a happy time in life." She explained how appellant became a stepfather when he was sixteen, having just returned from TYC. She did not know that appellant was continuing to commit crimes when he was sixteen and seventeen, nor did she suspect that he was in a gang. She was "hurt, destroyed," when she heard appellant had been arrested for this capital murder. It was not something she would have predicted. She said that appellant was the kind of person who can follow rules and that he could be a positive influence on people's lives even if he was in prison. The State did not cross-examine appellant's mother.

[49] Article 36.02 governs a party's right to reopen the testimony. It provides that the trial court "shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice." TEX.CODE CRIM. PROC. art. 36.02. "Due administration of justice" means a judge should reopen the case if the proffered, admissible evidence would materially change the case in the proponent's favor. *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003). To establish a material change, the proponent must show that the evidence is "more than just relevant–it must actually make a difference in the case." *Id.*

A trial judge commits error when he denies a motion to reopen to allow a witness to testify when the following criteria are satisfied:

(1) the witness is present and ready to testify;
(2) the motion to reopen is made before final arguments and before the charge is read to the jury;
(3) the movant states with specificity what testimony the witness is expected to give and the importance the testimony carries; and
(4) it does not appear that the motion's purpose is to frustrate the due administration of justice.

issue for review.[50]

Furthermore, we have previously rejected the claim that a capital defendant should be entitled to present "execution-impact" testimony from his friends and family. Most recently, in *Gallo v. State*,[51] we explained that such evidence "is objectionable because it does not pertain to appellant's background, character, or record, or the circumstances of the offense."[52] As we have stated, this type of evidence is simply an emotional plea for sympathy, rather than a rational response to objective facts.[53] In *Fuller v. State*, our seminal case on this issue,

---

*Scott v. State*, 597 S.W.2d 755, 758 (Tex. Crim. App. [Panel Op.] 1979). In this case, appellant did not request to reopen the testimony; he did not show that appellant's mother was present and ready to testify; although he did tender the letter that he wished to offer, he did not explain how this evidence was either admissible or important in answering the special issues. Therefore, the trial judge did not abuse his discretion in overruling appellant's untimely request to present "execution-impact" evidence, even if a constitutional or statutory right to present such testimony existed.

[50] TEX. R. APP. P. 33.1

[51] 239 S.W.3d 757 (Tex. Crim. App. 2007).

[52] *Id.* at 779; *see also Jackson v. State*, 33 S.W.3d 828, 834 (Tex. Crim. App. 2000); *Ross v. State*, 954 So.2d 968, 1012-13 (Miss. 2007) ("[T]estimony regarding the impact a death sentence may have on the defendant's family is not 'relevant mitigating evidence,' because it does not address the defendant's character, record, or the circumstances of the offense."); *People v. Viera*, 106 P.3d 990, 1009 (Cal. 2005) ("A statement about how a defendant's death would make the family member suffer is not relevant to an individualized determination of defendant's culpability and may be properly excluded. . . . 'The specific questions whether family members would prefer that defendant not be executed or believe that a death sentence will stigmatize them are not, however, strictly relevant to the defendant's character, record or individual personality.'"); *People v. Armstrong*, 700 N.E.2d 960, 971 (Ill. 1998) (trial judge properly excluded testimony by capital-murder defendant's sister regarding the effect the death penalty on her family; such evidence "was wholly tangential to the defendant's character and the nature of his offense"); *State v. Stenson*, 940 P.2d 1239, 1279-82 (Wash. 1997) (trial judge did not err in excluding "execution-impact" testimony).

[53] *See McFarland v. State*, 928 S.W.2d 482, 522-23 (Tex. Crim. App. 1996) ("As appellant acknowledges, this Court has held that an emotional plea from a relative that a capital defendant's life be spared is objectionable evidence, because it 'does not pertain to appellant's background,

the capital-murder defendant wanted to offer testimony from his relatives "concerning their love for him and their desire to see him live."[54] But we rejected his claim because the evidence was irrelevant to the punishment issues.

In this case, as in *Fuller*, appellant does not contend that he was prevented from offering any evidence concerning his background, character, record, or the circumstances of his crimes. His complaint is simply that he was not permitted to ask his friends and family if they wanted to see him live. First, the United States Supreme Court has never said that "execution-impact" testimony is constitutionally mitigating. Indeed, it has held that juries in a death-penalty case may be instructed that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."[55] Second, the "execution-impact" testimony does not address a relevant issue under Article 37.071. Third, the jury was capable of inferring that appellant's mother, crying as she testified about her son's upbringing and his happy, healthy, church-going childhood, did not want her son to be

---

character, or record, or the circumstances of the offense[.]' This signals as a matter of state law that any purely emotional appeal has no relevance to the jury's assessment of 'the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant[.]'") (citations omitted).

[54] *Fuller v. State*, 827 S.W.2d 919, 935 (Tex. Crim. App. 1992).

[55] *California v. Brown*, 479 U.S. 538, 539, 543 (1987) ("An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'").

executed.

In sum, just as the victim's family members may not testify about their desire for appellant to be sentenced to death, members of appellant's family may not testify about their desire for the jury to spare his life. The special issues must be answered rationally, not on the basis of mere sympathy, passion or prejudice. Appellant's thirteenth, fourteenth, and fifteenth points of error are overruled.

**The State's Challenge for Cause**

In his sixteenth point of error, appellant claims that the trial judge erred when he granted a State's challenge for cause of venire member Alexandria Dunwood in violation of his Sixth Amendment right to a fair trial. Appellant claims that Ms. Dunwood was not subject to a challenge for cause because "[i]t is unclear if the Juror was an opponent or a proponent of the death penalty."[56] We disagree. The trial judge did not abuse his discretion in finding that Ms. Dunwood was unable to return a verdict that would require a death sentence.

In this case, all members of the venire filled out a questionnaire asking, among other things, for their thoughts about capital punishment. Those venire members whose answers disqualified them from service were then excused. Next, the remaining venire members were questioned in small groups, and the trial judge asked if they could follow and apply certain legal principles. Again, those potential jurors who could not follow the law were excused.

---

[56] Appellant's Brief at 68.

During this winnowing procedure, many venire members were also excused by agreement. After group questioning, the remaining venire members were questioned individually about their feelings concerning capital punishment.

Ms. Dunwood was Juror Number 90. The prosecutor questioned Ms. Dunwood about her questionnaire answers and her ability to return a verdict that would result in the imposition of the death penalty:

Q: . . . The other question was: Do you have any moral, religious, or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? You didn't answer that question. Was there a reason why you didn't answer it?

A: Well, I just–really, I was like, I don't really know what my answer would be to that question. That's why I didn't answer it. There were a lot of questions that I didn't answer because I really didn't know what I should answer, you know.
...

Q: So, that's why that question is in there, along with some of the others, is to ask you to think about whether this is something you could do. And so, since you came in and filled out your questionnaires on Friday, maybe you've had a little time. Have you thought about whether this is something you could do?

A: I thought and I was like no, it's probably not something I could do.

Q: You feel like because of your beliefs or whatever reason that you could not sit on a jury where the [State] is seeking the death penalty. Is that what you're saying?

A: Yes.

Q: Do you feel like it would do violence to your conscience to have to answer questions in a way that could cause the defendant to be executed, to be given the death penalty?

A: Yes.

Q: And let me just–and I'm going to ask you this question a certain way. And it may be

a little wordy, but what I'm hearing you say is you have conscientious scruples in regard to the infliction of the punishment of death for a crime. Is that–

A: Yes.

Q: You do feel that way?

A: Yes.

The prosecutor then moved to strike Ms. Dunwood for cause.[57] The trial judge then gave the defense an opportunity to question her:

Q: . . . Are you saying to us that it wouldn't matter how bad the case was, it wouldn't matter what the facts were, it wouldn't matter how justified you might feel in reaching the verdict that might result in death, but you couldn't do it no matter what. Is that what you're saying to us?

A: Just because of the death penalty, that's the only reason why.

...

Q: So, it wouldn't matter how bad the case was, you couldn't do it?

A: I could do it. It's just the outcome. The outcome would be. It might be different than what I might go for.

Q: Let me see if I hear what you're saying. Are you saying that you might could find someone guilty of capital murder, but you would never be able to give him the death sentence?

A: Yes.

Q: No matter what the answers to the questions ought to be, you wouldn't be able to

---

[57] The prosecutor's exact words were, "State has a motion, Your Honor." Appellant argues that "at no point [does] the State articulate a reason for striking this juror," and claims that it was unclear as to what the State's motion actually was. However, taken in context, it is clear that the "motion" was a challenge for cause. The prosecutor had used the same language without confusion throughout voir dire when making challenges for cause.

answer them because you could not ever participate in giving someone the death penalty?

A: True.

Q: No matter what they did?

A: Uh-huh.

Q: No matter how bad it was?

A: It depends on what actually happened during the case to me.

At this point, the prosecution objected to any "further questioning by the defense counsel," arguing that Ms. Dunwood had "made herself clear." The court sustained that objection and granted the State's challenge for cause. Defense counsel noted for the record that the juror's last response was, "It would depend on what the evidence was." In response, the State requested the trial judge make a "finding on the record as to what her demeanor was and the way she answered the questions,"[58] to which the trial judge stated: "She obviously, obviously said that she could not do it. And I believe any further questioning would be fruitless."

Our system of justice does not "entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death."[59] Thus, to be an eligible juror in a capital case, one must be able to envision some factual scenario in which the defendant is

---

[58] Appellant complains, "The objection, challenge, and demeanor request were confusing to the point of being undecipherable." Appellant's Brief at 66 n.21. However, we understand that the participants–prosecutor, defense attorney, and judge–were clarifying the issue for appellate review.

[59] *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).

guilty of capital murder, but not deserving of the death penalty.[60] Conversely, a capital juror must also be able to consider a death sentence to be appropriate in some circumstances.[61] While those with "general objections to the death penalty or expressed conscientious or religious scruples," may not be excluded from a jury for cause, a juror who "in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."[62] This Supreme Court rule ensures that neither the State nor the defendant play with a "stacked . . . deck."[63]

We have noted that "[t]he record need not establish a venire member's bias with unmistakable clarity" to support a challenge for cause.[64] If a juror vacillates between positions, reviewing courts must defer to the trial judge's determination of whether a challenge for cause is appropriate.[65]

Appellant asserts that Ms. Dunwood's final answer—that her verdict in a death penalty trial would "depend on what happened in the case"—showed that once she "was

---

[60] *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

[61] *Witherspoon*, 391 U.S. at 522 n.21.

[62] *See Morgan*, 504 U.S. at 728 (internal quotation marks omitted).

[63] *See Witherspoon*, 391 U.S. at 523.

[64] *Barefield v. State*, 784 S.W.2d 38, 44 (Tex. Crim. App. 1989).

[65] *Id.* ("'[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.'") (quoting *Wainwright*, 469 U.S. at 425-26).

educated about the difference between 'would' and 'could,'" she was an acceptable juror.[66]

We disagree. Ms. Dunwood's final statement was the only response indicating that she might be open to considering a death sentence. Viewed in context, that one statement does not convince us that she was an impartial juror. More importantly, it did not convince the trial judge, to whom we owe great deference.[67] First, Ms. Dunwood had not answered any capital-punishment questions on the questionnaire. When asked why, she explained that initially she was unsure, but, after thinking about it, voting to impose a death sentence was "probably not something [she] could do." Second, Ms. Dunwood agreed that (1) she "could not sit on a jury where the [State] is seeking the death penalty," (2) "it would do violence to [her] conscience to have to answer questions in a way that could cause the defendant to be executed," and (3) she had "conscientious scruples in regard to the infliction of the punishment of death[.]" This is not the mind set of an impartial juror willing to consider both a life and a death sentence.

During defense questioning, Ms. Dunwood continued to answer in the same vein, noting that she "could find someone guilty of capital murder, but [she] would never be able to give him the death sentence." She agreed that "no matter what the answers to the questions ought to be, [she] wouldn't be able to answer them because [she] could not ever participate in giving somebody the death penalty." It was only after all of this questioning, that Ms.

---

[66] Appellant's Brief at 64.

[67] *See Barefield*, 784 S.W.2d at 44.

Dunwood said that her decision to impose capital punishment "depends on what actually happened during the case."

At best, Ms. Dunwood was a "vacillating juror," but even that is dubious. Only after unequivocally saying that she could not be impartial eight different times, did Ms. Dunwood say that her decision would "depend on the facts of the case." This single response does not establish her ability to follow the law; her answer may have been a concession to stop a seemingly endless barrage of questions. The significance of her answer, taking into account her accompanying tone and demeanor, was a factual determination for the trial judge.[68]

Appellant complains that the State "wanted her off of the jury for no other reason [than] she was not wholeheartedly pro-death."[69] That may be true. But the prosecutor's subjective intent is irrelevant. The prosecutor asked a series of questions that Ms. Dunwood honestly answered, and her honest answers rendered her subject to a challenge for cause. Therefore, we overrule appellant's sixteenth point of error.

**The Admissibility of Appellant's Statements**

In points of error eighteen and nineteen, appellant claims that the statements he made to Sergeant Gore should have been suppressed because they were the product of custodial interrogation and were given without *Miranda*[70] warnings. In his seventeenth point of error,

---

[68] *Barefield*, 784 S.W.2d at 44.

[69] Appellant's Brief at 67.

[70] *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant also relies on the Texas confession statute, Article 38.22, but the warnings set out in that statute, like *Miranda*, apply only to custodial

appellant contends that we should abate this case to the trial court for written findings of fact and conclusions of law concerning the voluntariness of the statements he made to Sgt. Gore. And, in points of error twenty through twenty-two, appellant argues that his three recorded station-house confessions were obtained in violation of the deliberate "question first, warn later" strategy denounced in *Missouri v. Seibert*.[71] We disagree. Because Sgt. Gore's roadside questioning was simply an inquiry into whether appellant had been shot, that conversation did not constitute custodial interrogation for purposes of *Miranda*. And because appellant was given (and voluntarily waived) his *Miranda* and statutory warnings before he was questioned at the police station, all of his recorded statements were properly admitted at trial.

Sgt. Gore testified that, after the chase had ended, he approached the white Cadillac from which appellant had been removed. As he inspected the interior of the car, Sgt. Gore noticed that there was "blood everywhere[,]" so he informed his superior, who then told him to "Go check on [appellant], and make sure he's not injured. That way if he is, we can get him medical attention." Sgt. Gore then approached appellant–who was sitting in a patrol car, under arrest–and asked "if he had been shot." The following exchange then took place:

Appellant: No, I'm fine.

Sgt. Gore: Well, you've got blood all over you.

---

interrogation statements.

[71] 542 U.S. 600 (2004).

Appellant: That's not mine. That's the driver's.

Sgt. Gore: Well, you were driving.

Appellant: No. It belongs to the guy I took the car from.

It is undisputed that appellant was in custody; the legal question is whether Sgt. Gore "interrogated" appellant for the purposes of *Miranda*. We conclude that he did not.

Under *Miranda,* the government may not use any statements "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[72] These protections apply whenever a person in custody is subjected to either express questioning or its "functional equivalent." The word "interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[73] The *Miranda* warnings protect suspects from the "inherently compelling pressures" associated with the police-interrogation environment.[74]

However, not all questions that an officer might ask a suspect who is in custody will trigger the *Miranda* requirements. For example, "[r]outine booking questions . . . do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to

---

[72] 384 U.S. at 444.

[73] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[74] *See Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

prevent."[75] Similarly, "questions mandated by public safety" are "outside the constitutional definition of 'interrogation.'"[76] We use an objective test to determine whether the questioning in a specific situation constitutes interrogation.[77] As the Supreme Court explained in *Innis*, because "the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response."[78] Brief, neutral questions that are not intended to elicit a confession or admission of guilt, asked in the wake of an accident or other similar event that would normally evoke an inquiry, are not considered "interrogation" for purposes of *Miranda*.[79]

We review a trial judge's denial of a *Miranda*-violation claim under a bifurcated

---

[75] *Alford v. State*, 358 S.W.3d 647, 654 (Tex. Crim. App. 2012) (internal quotation marks omitted).

[76] *Jones v. State*, 795 S.W.2d 171, 174 n.3 (Tex. Crim. App. 1990).

[77] *See United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002) (test of whether a defendant is being "interrogated" for purposes of *Miranda* is whether a reasonable, objective observer would have believed that the question claimed by the defendant to have been unlawful interrogation was in fact reasonably likely to elicit an incriminating response).

[78] 446 U.S. at 301-02.

[79] *See State v. Simoneau*, 402 A.2d 870, 873-74 (Me. 1979) ("[Q]uestions asked in the wake of an event or occurrence which would naturally tend to evoke such an inquiry do not constitute interrogation. These questions, unlike the sort of interrogation which prompted implementation of the *Miranda* safeguards, are characterized by brevity, neutrality and absence of an intent to elicit a confession or admission."); *State v. Barnes*, 252 A.2d 398, 401 (N.J. 1969) ("It seems clear to us that the essence of the situation was not an officer imposing a process of interrogation upon a suspect, but an officer reacting naturally and spontaneously to the scene before him"; *Miranda* did not apply).

standard.[80] We afford almost total deference to the trial judge's factual findings and his application of law to fact rulings that turn on credibility and demeanor.[81] When there is no factual dispute as to whether *Miranda* warnings were given, what questions the officer asked, or what answers the defendant gave, the question of whether the defendant was subjected to "interrogation" is a mixed question of fact and law reviewed *de novo* because there are no disputed issues of fact that depend upon credibility or demeanor.[82]

Based on this record, we cannot say that Sgt. Gore was acting under the guise of inquiring about appellant's medical condition, but actually hoping to elicit an incriminating response. He repeatedly explained that his sole purpose in questioning appellant was to "check on his medical condition." While Sgt. Gore's subjective intent is not dispositive in an *Innis* "interrogation" analysis, it does shed some light on the situation to the extent it was communicated.[83] Furthermore, this record does not support any notion under the "should have known" test[84] that Sgt. Gore's brief questioning about appellant's medical condition was likely to elicit an incriminating response. As the State notes, police officers are under

---

[80] *Alford*, 358 S.W.3d at 652.

[81] *Id.*

[82] *Id.* at 652-53 ("The decision as to whether custodial questioning constitutes 'interrogation' under *Miranda* is a mixed question of law and fact"; if credibility and demeanor are not at issue, the question of "whether a set of historical facts constitutes custodial interrogation under the Fifth Amendment is subject to *de novo* review because that is an issue of law").

[83] *See Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

[84] *See Alford*, 358 S.W.3d at 653 n.9.

a general duty to ensure that, if a suspect is injured, he is provided proper medical attention.[85] The question Sgt. Gore asked appellant was in furtherance of this duty. Once Sgt. Gore was assured that appellant did not need immediate medical attention, he ceased questioning.

And, from a suspect's point of view, Sgt. Gore's question was not one "likely to elicit an incriminating response." Sgt. Gore's initial question, "Have you been shot?" was simply a yes or no question. Neither a "yes," nor a "no" would have been incriminating.[86] However, appellant's answer to that question was confusing and required some follow-up to ensure that (1) appellant was not actually suffering from a serious wound or trauma but was too confused or delusional to relay the correct information to the officer, or (2) there was not another person—perhaps the driver—who had been in the car with him, who may have left

---

[85] *See, e.g.*, *Sims v. State*, 735 S.W.2d 913, 917-18 (Tex. App.–Dallas 1987, pet. ref'd) (officer's questions as to whether defendant was sick, injured, physically impaired, etc., were not interrogation, but questions normally attendant to arrest and custody; such questions are "of legitimate concern to the police at any time a person is arrested and taken into custody because the police will be responsible, to some degree, for the arrested person's care and physical well-being"); *Al Amin v. State*, 597 S.E.2d 332, 348 (Ga. 2004) (post-arrest questioning by FBI agent who approached defendant after lengthy police chase and told him that he was a medic and asked if he was injured, was not "interrogation" for purposes of *Miranda*; "the question was asked for the sole purpose of assessing whether the suspect required medical aid, and was unrelated to the police investigation."). Indeed, the duty to "prevent injury" is one justification for a warrantless search. *See Mincey v. Arizona*, 437 U.S. 385, 392–93 (1978) (noting that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.").

[86] *See State v. Riggs*, 987 P.2d 1281, 1283-84 (Utah Ct. App. 1999) (police officer's question to defendant, who was in custody at hospital to which he had been taken after he sustained injuries in automobile accident, whether he remembered the accident, did not constitute "interrogation" for purposes of *Miranda*; question, which required simply a "yes" or "no" answer, was not one officer should have known was reasonably likely to elicit an incriminating response), *abrogated on other grounds by State v. Levin*, 144 P.3d 1096 (Utah 2006).

the scene, and was either a security threat or in need of immediate medical attention.

In sum, Sgt. Gore's questions neither presented appellant with the "psychological intimidation" associated with a police interrogation nor was it an underhanded way of bypassing *Miranda* and eliciting an incriminating response.[87] Sergeant Gore was asking appellant if he was in need of immediate medical attention, an inquiry that was appropriate under the circumstances and one that did not raise any concern of coerciveness or compulsion.[88] Appellant's eighteenth and nineteenth points of error are overruled.

In his seventeenth point of error, appellant asks this Court to abate his appeal and remand the case to the trial court for more complete factual findings and legal conclusions surrounding appellant's roadside statement to Sergeant Gore. That is unnecessary. Appellant points to Section 6 of Article 38.22, specifically that "the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based." However, appellant has raised no question of the factual voluntariness of his statements to Sgt. Gore. There is no

---

[87] *See Innis*, 446 U.S. at 301-02; *Alford*, 358 S.W.3d at 653-54.

[88] *See Innis*, 446 U.S. at 301. Appellant relies on *Clemmer v. State*, 645 S.W.2d 918 (Tex. App.—Fort Worth 1983, no pet.), for the proposition that "[a]n interrogation does not just consist of questions." Appellant's Brief at 81. That may be true, but that proposition does not convert Sgt. Gore's questions about appellant's possible injury into "interrogation." *Clemmer* involved an automobile accident, after which a police officer came into the defendant's hospital room and announced that "the girl in the other car had died." That was the type of announcement that was likely to elicit an incriminating statement and it did: the defendant responded, "I don't give a f____ if anyone is dead, I am hurting." *Id.* at 919. In the present case, however, none of Sgt. Gore's questions were likely to elicit an incriminating statement, they were intended simply to ensure that appellant was not the person who had left all that blood in the white Cadillac.

dispute over the facts of who said what to whom and when. The question that appellant raised at trial and in his appeal is whether their roadside conversation was an "interrogation" for purposes of *Miranda.* That is a purely legal question that we review *de novo.*

At trial, appellant made two arguments to exclude his statement to Sgt. Gore. First, he claimed that the statement was the product of a "custodial interrogation" without *Miranda* warnings. Second, he argued that the statement was not relevant to the purpose for which it was being admitted. At no point did counsel argue that the statement was involuntarily given.

Although appellant challenged the voluntariness of several of his other statements during a pretrial hearing, he did not challenge the voluntariness of the roadside statement. Because there was no challenge to the voluntariness of this specific statement, there were no factual disputes surrounding the issue of voluntariness. Therefore, the trial judge only needed to rule on the motion; additional factual findings were (and are) unnecessary. We overrule appellant's seventeenth point of error.

In his final three points of error, appellant complains about the admission of his three recorded and Mirandized "custodial interrogation" statements that he gave to three different officers concerning three different offenses: the first statement was given to Sgt. Sidney Miller concerning the capital murder of Horace Holiday; the second statement was given to HPD Officer Mike Miller concerning the Black Widow tattoo-parlor capital murder; the third statement was given to Sgt. Tonry concerning the Phat Kat Tats tattoo-parlor aggravated

robbery. Appellant claims that the statements are a "tainted trifecta" under *Missouri v. Seibert*'s[89] "question first, warn later" prohibition because of Sgt. Gore's brief un-Mirandized inquiry into appellant's medical condition back at the arrest scene.

In *Seibert*, the Supreme Court addressed a situation in which police officers engaged in a deliberate strategy to question an arrested suspect without *Miranda* warnings and then, after she had confessed, gave her the required warnings and continued the interrogation in an effort to re-elicit the same incriminating responses that she had already made.[90] A plurality of the Court "envision[ed] an objective inquiry from the perspective of the subject, and applies in the case of both intentional and unintentional two-stage interrogations."[91] In *Carter v. State*,[92] we expressly adopted Justice Kennedy's concurring opinion in *Seibert* because his was the crucial fifth vote and his opinion was "narrower in scope than the plurality opinion and applies only to two-step interrogations involving deliberate police misconduct."[93] Thus, only those interrogations in which police employ a deliberate "question first, warn later" strategy run afoul of the Fifth Amendment.

At trial, appellant did not make any reference to *Seibert*, *Carter*, "two-step

---

[89] 542 U.S. 600 (2004).

[90] *See generally*, *id.* at 604-17.

[91] *Id.*, at 621 (Kennedy, J., concurring).

[92] 309 S.W.3d 31 (Tex. Crim. App. 2010).

[93] *Id.* at 38; *see also Martinez v. State*, 272 S.W.3d 615, 626-27 (Tex. Crim. App. 2008) (applying the reasoning from Justice Kennedy's concurrence in determining the admissibility of a statement obtained through a deliberate two-step custodial interrogation).

questioning," "question first, warn later," or any other argument that might raise an issue under *Seibert*. Instead he objected to the admissibility of his three confessions based on voluntariness.[94] Indeed, the trial judge's findings of fact and conclusions of law are directed only to the general voluntariness of his confessions. Appellant has therefore failed to preserve any issue concerning a "question first, warn later" deliberate interrogation strategy.[95]

But even if appellant had preserved this issue for appeal, his claim is without merit. As we have previously concluded, appellant's roadside statement to Sgt. Gore was not the product of custodial interrogation, and therefore Sgt. Gore was not required to give appellant any *Miranda* warnings before appellant's responses were admissible at trial. Because appellant's first statement was not the product of custodial interrogation, *Seibert* is inapplicable as the "question first, warn later" situation arises only when both the unwarned and warned statements are the product of custodial interrogation.[96] Furthermore, there is no suggestion that the three officers who obtained station house confessions ever mentioned any statement that appellant had already made to Sgt. Gore, or that Sgt. Gore's inquiry had been

---

[94] Appellant does not argue, on appeal, that any of appellant's three custodial interrogation statements were "involuntary" under the Fifth or Sixth Amendments or under Article 38.22.

[95] *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005).

[96] *See Seibert*, 542 U.S. at 604 (explaining that a "midstream warning" occurs when police begin a custodial interrogation without advising the suspect of his *Miranda* rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements).

part of a deliberate two-step interrogation.[97] For the above reasons, we overrule appellant's twentieth through twenty-second points of error.

Finding no reversible error, we affirm appellant's conviction and sentence.

Delivered: June 5, 2013
Do not Publish

[97] *See Carter*, 309 S.W.3d at 40-41 (finding no "deliberate 'question first, warn later' gamesmanship" when the pre-warning officer's questioning was brief, uncoercive, and conversational).